UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Fortune Funding, LLC, a Florida limited liability company,

Plaintiff,

v.

Ceridian Corporation, a Delaware corporation,

Defendant.

File No. 00-1809DSD/FLN

**STIPULATION AND ORDER**

---

WHEREAS, in the trial in the above-captioned matter, portions of the deposition of James Nolan was read to the jurors;

WHEREAS, in the trial in the above-captioned matter, portions of the deposition of Roland Cauldwell was presented to the jury by way of videotape;

WHEREAS, the portions of the depositions that were read or played to the jurors were not simultaneously recorded by the court reporter;

WHEREAS, a true and correct copy of the portions of the James Nolan deposition that were read to the jurors is attached hereto as Exhibit A;

WHEREAS, a true and correct copy of the portions of the Roland Cauldwell deposition that were played to the jury is attached hereto as Exhibit B;

WHEREAS, the parties desire that Exhibit A and Exhibit B become a part of the district court record;

NOW, THEREFORE, the parties, by and through their undersigned counsel, have stipulated and agreed that Exhibit A and Exhibit B be made part of the District Court record as true and correct representations of the deposition testimony that was read or played to the jurors.

FILED 9-26-02
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Dated: 9/18/02

Gary A. Van Cleve (156310)
Christopher J. Deike (290300)
LARKIN, HOFFMAN, DALY & LINDGREN, Ltd.
1500 Wells Fargo Plaza
7900 Xerxes Avenue South
Bloomington, Minnesota 55431-1194
(952) 835-3800

Attorneys for Plaintiffs

Dated: 9/23/02

DORSEY & WHITNEY LLP

By:
Steven J. Wells (#163508)
Randall Frykberg (#257941)
Eric Moutz (#0304670)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Attorneys for Defendant Ceridian Corporation

**ORDER**

Based on the above Stipulation of counsel, it is hereby ordered that

1. Exhibit A and Exhibit B attached to this Stipulation shall be made a part of the record as a true and correct representation of the deposition testimony that was read or played to the jurors.

Dated: 9/25/02

The Honorable David S. Doty
Judge of United States District Court

796030.1

**James Nolan Designations**

Page 4
7 Q. Would you state your name for the record,
8 please.
9 A. James Nolan.
10 Q. And your address?
11 A. 6190 Southwest 102 Street, Miami, Florida.
12 Q. By whom are you employed, Mr. Nolan?
13 A. United Trust Fund.
24 Could you confirm that you are, in fact,
25 appearing on behalf of United Trust Fund in response to
PAGE 5
1 that deposition notice?
2 A. Yes.
3 Q. I think what I will do, Mr. Nolan, if this
4 is acceptable to you, is I will assume that you are
5 speaking on behalf of UTF, United Trust Fund in response
6 to the Rule 30 (b)(6) notice that I marked as 115 unless
7 you tell me otherwise. Okay?
8 A. Yes.

PAGE 7
12 Q. Could you tell me a little bit about your
13 background? First why don't you start with college and
14 tell me about your education.
15 A. I went to Northeastern University in

EXHIBIT A

Boston, Massachusetts. Graduated with a degree -- bachelors degree in business administration in 1971.

Q. Have you taken any course work at a college that did not lead to a degree?

A. I've taken a number of various courses over my business career.

Q. Having to do with real estate?

A. Real estate, banking, finance.

PAGE 8

Q. Any other course work that led -- that was in a degree program but for which you didn't receive a degree?

A. I took courses at the University of Miami for real estate salesman in the State of Florida. Other courses resulting in Florida broker's, real estate broker's license. Correspondent courses with the NASD resulting in a principal's license.

PAGE 9

Q. Would you describe your work history for me following college.

A. From 1971 through 1978 I worked for the Federal Deposit Insurance Corporation in Washington, DC. From '78 to '81 I worked for First Capital Companies, Coral Gables, Florida. Part of '81 I worked for MDC

Corporation, Denver, Colorado. And since 1982 I've worked
for United Trust Fund.

PAGE 10

Q. What did you do at the FDIC?

A. Bank examiner and bank liquidator.

Q. Did that job entail any sale or acquisition of real estate, commercial real estate?

A. Yes.

Q. What kinds of commercial real estate transactions were you involved with?

A. Just about all types of commercial real estate.

Q. What was your -- in what connection did you deal with real estate with the FDIC?

A. I was the assistant Liquidator of American Bank & Trust Company appointed by the Supreme Court of the State of New York to liquidate the portfolio and assets of American Bank & Trust Company.

Q. And those assets included commercial real estate holdings?

A. Some of them, yes.

Q. What was your position at First Capital Companies?

A. Senior investment officer.

Q. That was here in Florida?
A. Yes.
Q. What were your responsibilities as senior investment officer?

PAGE 11
A. To analyze and acquire income properties throughout the southeast United States.
Q. Again, real estate?
A. Correct.
Q. In that position you had responsibility for sale and purchase of various commercial real estate properties?
A. Just acquisitions.
Q. Can you give me some idea of the value of the properties that you were involved with? Were these large commercial properties, small?
A. Basically for the most part they were strip

PAGE 12
shopping centers anchored by major grocery stores and drug stores and tenants, smaller tenants. Some industrial properties and some office properties.
Q. Can you give me a range of the value of these properties?
A. Typically I would say 5 to 20 million dollars.

Q. You were at that position for about three years; right?

A. Correct.

Q. How many real estate transactions or real cstatc acquisitions wcrc you involved with, would you say?

A. 30, 40.

PAGE 13

Q. Then you went to UTF?

A. Correct.

Q. That's United Trust Fund?

A. Correct.

Q. What is -- I'll just call it UTF. What is UTF?

A. UTF is a Florida corporation which is the principal owner of United Trust Fund Limited Partnership which is a Delaware limited partnership which is involved

PAGE 14

in the acquisition, financc, owncrship and disposition of net lease properties.

Q. What was your -- what has been your -- what have been your titles at UTF?

A. Executive vice-president, chief financial officer.

Q. And that's from 1982 to today?

A. Correct.

Q. What areas are you responsible for as executive vice-president and chief financial officer?

A. I'm generally responsible for just about everything.

Q. Are you involved -- I take it from some of the literature that I've seen that United Trust Fund is involved in sale and leaseback transactions among other things; is that right?

A. Correct.

Q. Do you actually involve yourself with the acquisition of properties?

A. Yes.

Q. Are the properties always commercial real estate or is it some other kind of real estate?

A. Always commercial real estate.

Q. So you've been involved for most of your career in one way or another with the acquisition or sale

PAGE 15

of commercial real estate; is that a fair statement?

A. Correct.

Q. At UTF, how many transactions relating to commercial real estate would you say you've been involved with?

A. More than 100.
Q. Is it fair to say you're highly experienced with respect to the acquisition of commercial real estate?
A. Yes.
Q. Would you consider yourself highly experienced in sale and leaseback transactions too?
A. Yes.
Q. Let me ask you some more questions about UTF.
There is an entity that is involved in this particular matter that's called Minnesota UTF. Are you familiar with that?
A. Not off the top of my head, no.
Q. Did UTF set up subsidiary corporations to deal with commercial transactions in various states?
A. We have done that, yes.
Q. Do you know if there was, at one time at least, an entity called Minnesota UTF?
A. Not off the top of my head, no.

PAGE 16

(Thereupon, Nolan Exhibit 116 was marked for identification.)
Q. Mr. Nolan, the court reporter just handed you what's been marked Nolan Deposition Exhibit 116.

A. Yes.
Q. This was a document that was produced in this case by Prudential Insurance Company which is one of the plaintiffs in this action. Does this look familiar to you?
A. Yes.
Q. What is it?
A. A reprint of a promotional article on the company.
Q. Is this an article that UTF prepared?
A. I believe it came out of the Forum Real Estate and then it was recut and used for our promotional purposes, yes.
Q. Is this something that UTF or one of its agents prepared itself?
A. I would say yes.
Q. Do you know the date of this article, approximately?
A. Well, it was before 1985.
Q. It says you're 39. When would that have been?

PAGE 17

A. I was born in 1946, so you do the math on

that.

Q. This article mentions that United Trust Fund has grown into one of the country's busiest investment firms doing sale-leasebacks. That's on the first page at the bottom of the first column. Do you see that?

A. Yes.

Q. And it says that UTF had done sale-leasebacks with Wells Fargo Bank, Bank of America, Great American Insurance Company, Ashland Oil, Howard Johnson's, many other big companies. Is the information in that paragraph accurate?

A. Yes.

Q. And then Sidney Domb is quoted if the next paragraph. Do you see that?

A. Yes.

Q. Who is Sidney Domb?

A. He's the founder and the president of the company.

Q. He says that he's executed leases and purchased properties leased to General Mills, Shell Oil, Uniroyal, Chevron, General Foods, et cetera. Is that accurate too to the best of your knowledge?

A. Yes.

PAGE 18

Q. Over in the right-hand column on this first page you're quoted. You see that it says, "Jim Nolan, company's executive vice-president"?

A. Yes.

Q. You say that, quote, "We meet with financial management of our seller-client at their office and discuss his needs. No two companies are alike and each seller's financial situation is different. We address ourselves solely to what the seller's needs are. If our sales-leaseback is advantageous, we go right to contract." Do you see that?

A. Yes.

Q. Is that generally how you did business with potential sale-leaseback customers?

A. Yes.

Q. Do you have some estimate, Mr. Nolan, of the value of the properties that United Trust Fund has sold and leased back over the years?

A. Over a billion dollars.

Q. One billion?

A. Yes.

Q. As of 1985, do you have some estimate of

the value of the commercial real estate that had been sold and leased back?

A. No.

PAGE 19

Q. How long prior to 1985 had UTF been engaged in sale-leaseback transactions?

A. It's my understanding that the company was formed in 1972. So from '72, I started in '82, and prior to that the founder was a build to suit developer for most of the companies mentioned here, General Mills, Shell, Uniroyal, Chevron, Howard Johnson's, et cetera.

Q. Do you know if the company had been doing sale-leaseback transactions since 1972?

A. Yes.

Q. Is it fair to say though that most of your business has been in the sale-leaseback area?

A. That's correct.

Q. The court reporter just handed you Nolan Deposition Exhibit 117. Would you just take a minute and

PAGE 20

read through that, please.

A. Okay.

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. It was one of the ideas or concepts that I had concerning recapitalization or different capital structure for United Trust Fund.

Q. In general, is what you're doing seeking investors for United Trust Fund?

A. Yes.

Q. The date of this is on the second page is 5-13-85.

A. Correct.

Q. Is that accurate, is that when this was prepared?

A. Correct.

Q. Around that time?

A. Yes.

Q. Did you actually prepare this proposal yourself?

A. Yes.

Q. To the best of your knowledge, is the information in it true and accurate or was it true and accurate as of 1985?

PAGE 21

A. Yes.

Q. It says on the very first page of the

proposal itself, page 1, "United Trust Fund, one of the most successful and rapidly growing real estate investment organizations at the national level, has concluded hundreds of millions of dollars in sale-leaseback investments." I take it that was true as of 1985?

A. Yes.

Q. Would you turn to page 8 of this proposal.

The second full paragraph says, "United Trust Fund specializes in the purchase and leaseback of commercial and industrial properties with major public corporations, et cetera, et cetera." I take it that's true as well?

A. Yes.

Q. And was true as of 1985?

A. Yes.

Q. Down at the bottom in the last full paragraph it says, "Potential property acquisitions are analyzed for real estate value, credit quality and return on investment. Those properties which meet UTF's investment criteria receive immediate management attention leading to direct communication with the appropriate corporate officers. UTF's personalized service includes traveling to the corporate offices, meeting the decision

PAGE 22

makers and attempting to ascertain the corporate needs and objectives."

I take it that was your general practice at this time?

A. Yes.

Q. Is that still your general practice today?

A. Yes.

Q. At the bottom of page 12 is a summary. It says about half way down, sentence starts, "This is a

PAGE 23

business." Do you see that?

A. Uh-huh.

Q. "This is a business and to be successful it should be conducted by experts with years of knowledge and sophistication in this specialized field," and it continues on.

I take it from the rest of this paragraph that United Trust Fund considered itself an expert with years of knowledge and sophistication in this specialized field?

A. Yes.

PAGE 24

Q. Mr. Nolan, the court reporter handed you Nolan Exhibit 118. You realize that the subject of the

lawsuit or the subject properties in the lawsuit are what used to be called the Control Data headquarters building and some associated buildings; correct?

A. I didn't know about associated buildings, no.

Q. Do you remember that there's some modules called the mods?

A. I really am not familiar with that.

Q. I'll ask questions about Control Data headquarters building then.

A. Okay.

Q. United Trust Fund, I gather, was involved in the sale and leaseback of the Control Data headquarters building?

A. Yes.

PAGE 25

Q. Is this a -- is Exhibit 118 an ad that you prepared to publicize the sale and leaseback of the Control Data headquarters building?

A. Yes.

Q. Do you remember where the ad was placed? Was this placed in financial journals?

A. Yes.

Q. Real estate journals?

A. Yes.

Q. I'd like to ask you some questions now about the transaction involving Control Data headquarters tower in 1985.

Had UTF had any prior business dealings with Control Data Corporation prior to this transaction?

A. Are you including any kind of discussions on other properties or are you talking about other transactions with Control Data?

Q. Really any other business. Was there any other -- had you any other business transactions with Control Data prior to this sale and leaseback transaction?

A. Are you talking about discussions or are you talking about actual purchases?

Q. Well, actual purchases.

A. No.

PAGE 26

Q. Had you discussions with them before?

A. Their name had come up numerous times through brokers and things like that, so, you know, I would guess that we probably had. But I don't have any knowledge.

Q. But you're confident that there were no

prior business transactions?
A. Yes.
Q. I take it too that there was no prior business relationship between Control Data and UTF?
A. Not that I'm aware of.
Q. How did the opportunity involving Control Data headquarters building come to your attention?
A. I believe Dain Bosworth who is -- who at that time was a regional brokerage and investment banking firm who we had a relationship with, gave us the lead on the property.
Q. Do you remember who at Dain Bosworth you talked to?
A. Yes, I do. A fellow by the name of Phil Goin, G-o-i-n.
Q. Is he still with Dain Bosworth, do you know?
A. No, he's not.
Q. Do you know where he is now?

PAGE 27

A. I lost track of him about ten years ago.
Q. Do you remember -- did he bring this to you as a possible opportunity?
A. Yes.

Q. Did you have some prior relationship with Mr. Goin?
A. Yes.
Q. What did he say about the potential for a transaction involving the Control Data headquarters tower?
A. I don't remember what he said. But what he -- the facts are that they were interested in a sale-leaseback and were we interested in buying the building.
Q. Do you recall approximately when this was?
A. I don't.
(Thereupon, Nolan Exhibit 119 was marked for identification.)
Q. The court reporter has handed you what's been marked as Nolan Exhibit 119. Would you take just a minute and read through that, please.
A. Okay.
Q. This is a letter from you to a Mr. David Yale at Prudential dated June 17, 1985; correct?
A. Correct.
Q. I'm trying to establish some time frames

PAGE 28
here.

Apparently you were involved in he at least negotiating this transaction during June of 1985; is that fair?

A. Correct.

Q. Can you tell from this letter, Mr. Nolan, how long you had been negotiating or considering this sale and leaseback transaction?

A. I can't tell from this letter, no.

Q. Does it jog your memory as to when you were first contacted about this?

A. I would, I would say that it was probably two to three months at the most before this letter.

Q. Maybe you can tell me, how did this transaction unfold? Take it step by step for me so I understand what happened.

A. Well, it's 16 years ago.

Q. I understand. To the best of your recollection.

A. My recollection is that I went to Minneapolis and I met with the executives of Control Data Corporation and we came to a business understanding about the sale and leaseback of Control Data headquarters building and the Minnetonka facility. That understanding

was then put into a purchase agreement. During the time

PAGE 29

of our understanding and the closing, I met with David Yale and other people at Prudential Insurance Company and made an application for a first mortgage loan on the property which was subsequently acquired and funded in part by Prudential.

Q. Do you recall having discussions with anybody from Control Data before actually going to Minneapolis?

A. I absolutely don't remember the details of it, but I don't go without an appointment, so I obviously had some discussions with someone at Control Data. Had an appointment and went to visit with them.

Q. Do you remember -- let's take the time period prior to your visit to Minneapolis. Do you remember who you talked to at Control Data?

A. I don't.

Q. Do you remember the substance of the discussion?

A. I would absolutely remember the substance of the discussions would be their interest in selling and leasing back their headquarters facility and our interest in participating in the transaction.

Q. Can you be anymore specific about that about what you discussed?
A. Basically the broad general framework of a

PAGE 30

transaction.
Q. This letter that I've marked as Exhibit 119 appears to indicate that you met with Mr. Yale of Prudential Insurance Company the week before June 17, 1985. Did he come to you here in Florida or did you go to Minneapolis to meet with him?
A. I went to Minneapolis.
Q. Was that a separate visit, do you remember, than your visit to Control Data?
A. I cannot say because I made several visits and I don't remember if it was simultaneously or thereafter.
Q. How many visits did you make to Minneapolis in connection with this transaction?
A. I couldn't tell you exactly.
Q. More than three?
A. I would say yes.
Q. More than ten?
A. No.

Q. Somewhere between three and ten?
A. Yes.
Q. Did you go to the Control Data headquarters building?
A. Yes.
Q. How many times were you there

PAGE 31
A. Two to three times.
Q. Where was the closing?
A. Closing was in downtown Minneapolis.
Q. Did you go to Control Data headquarters two to three times prior to the closing?
A. Yes.
Q. Do you remember who you met with?
A. No, I don't.
Q. On these visits, what did you do?
A. The visit that most strikes my mind is the initial visit in which we talked about the transaction and the terms, et cetera, et cetera. The second visit was -- involved a tour of the facilities. And the third would probably be a similar kind of visit.
Q. Tour?
A. Site inspection, yes.
Q. Do you remember who led the tour?

A. I don't.
Q. Was it somebody from Control Data?
A. Absolutely. We never go unaccompanied.
Q. Did anybody else from UTF visit the Control Data headquarters?
A. The only other person that may have visited the headquarters would have been Sidney Domb.
Q. Did he accompany you?

PAGE 32

A. Yes. At least once.
Q. Did he go ---
A. To my recollection.
Q. Do you think he went on his own?
A. No.
Q. Mr. Nolan, on the two tours that you went on of the facilities, did you tour the entire headquarters building?
A. I would call it a limited tour.
Q. Did you ask to see any specific areas of the building?
A. No.
Q. What did you do on the tour, can you recall?

A. Essentially walked around the space.

Q. Did you walk around the inside?

A. Yes.

Q. Did you go up on the roof?

A. No.

Q. Did you walk around the outside?

A. Not all the way around.

Q. Partially?

PAGE 33

A. Yes.

Q. Did you ask to see any specific areas?

A. No.

Q. Was there anything preventing you from asking to see particular areas?

A. No.

Q. Did anyone suggest to you that you could see any part of the building you wanted to?

A. Yes.

Q. The Control Data people didn't restrict your access in any way, did they?

A. No.

Q. Did you ask for any information from Control Data in connection with this transaction or proposed transaction?

A. Other than financial information?

Q. Why don't you just tell me what you asked for, if you can recall.

A. Generally we get all published financial information.

Q. Was that provided by Control Data?

A. Yes.

Q. Did you ask for any other information?

A. We would have gotten real estate information, survey, title.

PAGE 34

Q. Was that information provided?

A. Yes.

Q. Do you recall requesting any other information from Control Data?

A. No.

Q. Is it fair to say that Control Data personnel provided you all the information you asked for?

A. Yes.

Q. Did anybody from Control Data tell you that you couldn't have access to certain information?

A. No.

Q. Did they tell you in essence that they'd

let you see what you wanted to see?

A. Yes.

Q. Was there -- you said you think you went on two tours. Was there a reason for the second tour?

A. Other than I wanted to be familiar with the, you know, with the general property, no.

Q. Did you do something different on the second tour than the first tour?

A. Not that I can recall.

Q. Did Mr. Domb accompany you on one of these tours?

A. Mr. Who?

Q. Domb. Am I saying his name right?

PAGE 35

A. If he was there, he was there only on one.

Q. But you're not sure whether he was there?

A. I'm not sure.

Q. Had you been to Minnesota prior to these visits in connection with the sale?

A. Yes.

Q. How many times?

A. I don't know.

Q. Do you recall what the weather was like?

A. Freezing. No. I make it a rule not to go

to Minnesota between, you know, December and February or March. Depending on the year.

Q. Do you remember the time of year when you conducted these tours or when you were taken on these tours?

A. Yes, it was in the summertime.

Q. Do you remember if it was raining, clear? Any recollection?

A. No.

Q. Just don't remember?

A. I really don't.

(Thereupon, Nolan Exhibit 120 was marked for identification.)

Q. Mr. Nolan, I've handed you what the court reporter has marked as Nolan Exhibit 120. Would you just

PAGE 36

take a minute and read through that, please.

A. Okay.

Q. Do you recognize Exhibit 120?

A. Yes.

Q. This is a letter from Robert Darr, Control Data Corporation to Peter Patchin, to you, attention Mr. M. Ramsland, Jr.

For the record, it bears Bates No. CER 34100.
Do you recall receiving this letter?
A. Yes.
Q. The author of this letter, Mr. Darr says, "I have been asked to outline the history and present status of the curtain wall system installed on the Control Data Corporation world headquarters building." Did you ask some questions about the tower curtain wall problems?
A. I don't know if I asked it or if it was brought up by the appraiser.
Q. Do you recall that there were some issues relating to the curtain wall problems on the headquarters tower?
A. I don't have a direct recollection about it because it certainly wasn't an issue in the transaction that I can recall. I do recall that the building was one of the first glass curtain wall buildings that was built,

PAGE 37

I was told. And I was also told obviously that the curtain wall system was leaking and that they had a plan for remediation and it was not an issue.
Q. Do you recall receiving Nolan Exhibit 120 around July 9, 1985?

A. Yes.

Q. You just mentioned that you got some information about the curtain wall. Do you remember who gave you that information?

A. No, I don't.

Q. Was it somebody at Control Data who told you that the curtain wall was leaking and that a remediation program was in place?

A. I just don't have any recollection.

Q. But you did have that information prior to the time you entered into the transaction?

A. Prior to closing, yes, sir.

Q. Do you recall asking any questions about the remediation program?

A. No.

Q. Do you remember whether the -- there's some information on the second page of this letter about a remediation program. It's in the third paragraph. It says, "The procedure is to use selected sealing materials appropriate to the task to be performed and to carefully

PAGE 38

apply the materials so that no water enters the curtain wall system behind or around the glass." Do you remember

asking any questions about that remediation procedure?

A. No.

Q. You'll see in the last paragraph it says, "We believe," and that's we as Control Data, would you agree?

A. Yes.

Q. "We believe that with the combination of the improved organic glass unit, careful installation of the unit and sealing the building with improved sealants, that the present and future curtain wall is better than originally installed." Do you see that?

A. Yes.

Q. Did you yourself conduct any inspection of the curtain wall?

A. No.

Q. Did you ask anybody else to inspect the curtain wall for you?

A. No.

Q. Were there any obstacles, was there anything preventing you from doing your own inspection of the curtain wall to your knowledge?

A. No.

Q. Did you do anything to determine whether or

PAGE 39

not Control Data's belief that's stated in that paragraph
was accurate or inaccurate?

A. No.

Q. Was there anything preventing you from conducting an inspection to determine whether Control Data's belief as stated in that paragraph was accurate or inaccurate?

A. No.

(Thereupon, Nolan Exhibit 121 was marked for identification.)

Q. Mr. Nolan, the court reporter has marked a document as Nolan Exhibit 121. It bears Bates No. CER 4709 through 4821. Those are the little numbers down in the right-hand corner.

You brought with you today closing books from the sale-leaseback transaction; correct?

A. Yes.

Q. Maybe you could just verify for me that Exhibit 121 is item No. 49 in the closing books which is the appraisal of the headquarters building.

A. Yes.

Q. Did you ask for an appraisal to be done?

A. It was -- yes.

Q. What was the purpose of the appraisal?
A. Determining the value of the building.

PAGE 40
Q. Who did you ask to do the appraisal?
A. Control Data.
Q. Is this the appraisal that was submitted to you by Mr. Patchin and Mr. Ramsland?
A. Yes.
Q. Did Prudential get a copy of the, all the closing materials, do you know?
A. What are you calling "closing materials"?
Q. Would Prudential have gotten a copy of the closing book?
A. No.
Q. Do you know whether Prudential received a copy of the appraisal?
A. It's my understanding that they did, yes.
Q. Is that because that was your practice to provide the appraisal to the financing source?
A. That was the agreement that I had with Prudential with respect to the financing of the transaction.
Q. Is that you would provide them with an

appraisal of the building?

A. Correct.

Q. If you'll turn to page -- again looking at those little numbers in the lower right-hand corner -- page 4811. That's the same letter that we just looked at,

PAGE 41

correct, marked as Exhibit 120, I believe?

A. Yes.

Q. So Exhibit 120, the letter from Mr. Darr, was a part of the appraisal; is that correct?

A. It appears to be, yes.

(Thereupon, Nolan Exhibit 122 was marked for identification.)

Q. The court reporter has handed you Nolan Exhibit 122. Do you recognize that document?

A. Yes.

Q. You see on the top of that document that the mortgagor is Minnesota UTF, II?

A. Yes.

Q. Does that refresh your memory as to the fact that there was an entity involved in this transaction called Minnesota UTF, II?

A. Yes.

Q. Do you recall now what Minnesota UTF, II

was?

A. A Florida general partnership.

Q. What was the relationship between Minnesota UTF, II and United Trust Fund?

A. The principals and ownership of Minnesota UTF, II were exactly the same as the principals and ownership of United Trust Fund, Inc.

PAGE 42

Q. Was this a limited partnership set up specifically to handle this sale and leaseback transaction with Control Data?

A. This appears to be a general partnership.

Q. General partnership, sorry.

A. That was set up specifically to handle this transaction, yes.

Q. And this document is the combination mortgage, security agreement and fixture financing statement between Minnesota UTF, II and then Prudential Insurance Company; correct?

A. Yes.

Q. And under this document Minnesota UTF is the mortgagor and Prudential is the mortgagee; correct?

A. Yes.

Q. Would you turn to page 9, please.
A. Yes.
Q. This has the Bates No. of FF 1008 in the lower right-hand corner. Do you see in paragraph 9 on page 9 there is the section entitled Inspection; correct?
A. Yes.
Q. And it states, "Subject to the rights of tenants under leases, mortgagee" -- that's Prudential; right?
A. Uh-huh.

PAGE 43

Q. You have to say yes or no.
A. Yes.
Q. -- "and its authorized representatives may enter the real estate or any part thereof at all reasonable times for the purpose of inspecting the property or any part thereof." Do you see that?
A. Yes.
Q. And the real estate is the headquarters building property; correct?
A. Yes.
Q. First off, to your knowledge, did Prudential exercise its right to inspect the headquarters building?

A. I have no knowledge.

Q. Is it fair to say, Mr. Nolan, that Minnesota UTF, II believed that it also had the right to enter the real estate or any part thereof at a reasonable time for the purpose of inspecting the property?

A. Yes. I believe that's contained in the lease.

Q. Was there any -- at any time either before or after the sale-leaseback transaction, Mr. Nolan, was there any occasion on which Minnesota UTF or UTF requested to inspect the headquarters building and was turned down by Control Data?

PAGE 44

A. No.

Q. Let me ask you some questions about some of your considerations in deciding to enter into this sale and leaseback with Control Data.

Are you familiar with the term "residual value"?

A. Yes.

Q. What does that mean?

A. The value of a property at some future period of time.

Q. As you use that term, do you use it to

mean, at least with respect to a transaction like this, the value of the building at the expiration of the lease period?

A. It could be, yes.

Q. When you're doing your financial calculations about whether to enter into a transaction such as the sale-leaseback with Control Data, do you consider residual value?

A. Yes.

Q. In what way?

A. If there will be some, there will be a lot or they'll be none.

Q. Do you actually try to put a residual value on a building?

PAGE 45

A. No.

Q. Why is that?

A. Well, we don't really believe we can forecast the future, so we don't try to.

Q. So if you can't put a value on it, how does it enter into your -- into the calculus of whether or not to do a deal?

A. Well, if we feel that the property has a high residual value, we might bid more aggressively in

terms of what the rent would be during the term of the lease. If we feel the property does not have a high residual value, we won't bid or bid less.

Q. Do you have any -- do you know if UTF has any documents that reflect what the -- what it felt the residual value of the Control Data headquarters might be?

A. No, we don't have any documents like that.

I see you brought with you today the closing books for the transaction with Control Data in July of 1985; correct?

A. Yes.

PAGE 47

Q. The court reporter has handed you what's been marked as Nolan Deposition Exhibit 123. Is this the lease agreement between Minnesota UTF and Control Data Corporation?

A. Minnesota UTF, II?

Q. Yes.

A. Yes.

Q. So this was the leaseback of the sale-leaseback transaction; right?

A. Correct.

Q. So the transaction, just in general, was Minnesota UTF, II purchased the land and the building, the

Control Data headquarters building from Control Data; correct?
A. Yes.
Q. And then it obtained financing for that sale from, in part, Prudential; correct?
A. Yes.
Q. And in part from an entity called I. Reiss & Son; correct?
A. Yes.
Q. Then simultaneous with the purchase Minnesota UTF, II would then -- entered into this lease agreement that I've marked as Exhibit 123 leasing the building and the land -- the building, I guess, back to

PAGE 48

Control Data; correct?
A. Building and land.
Q. Okay. We'll look at that in a minute.
And then the term of this lease was, the primary term was 15 years; correct?
A. Correct.
Q. Apart from the agreements that are contained in the lease and the other closing documents, did Minnesota UTF, II or UTF have any other agreements with Control Data Corporation?

A. Not to my knowledge.

Q. Did it have any other relationship with Control Data Corporation other than the agreements that are set forth in the various closing documents in the closing book?

A. Not to my knowledge.

Q. I want to ask you just some questions about the lease itself.

Control Data Corporation pursuant to this lease would lease the buildings and the land for a primary term of 15 years; correct?

A. Yes.

Q. Is it a fact, Mr. Nolan, that Control Data Corporation as lessee was not under the control of Minnesota UTF, was it?

PAGE 49

A. Correct.

Q. Control Data Corporation as lessee did not take any direction from Minnesota UTF, II; correct?

A. Correct.

Q. Control Data Corporation didn't have any authority to act on Minnesota UTF or UTF's behalf in connection with the lease, did it?

A. Outside of what's stated in the lease, that

would be correct.

Q. It didn't have any authority to bind Minnesota UTF, II to contracts, for example?

A. Well, it's kind of a gray area about certain contracts that they could let on the building, that that would, you know, cause rise to liens or claims against us, so, you know, that's a difficult legal question to answer.

Q. They didn't have the right to enter into contracts on behalf of Minnesota UTF, II, did they?

A. That's correct.

Q. You're familiar with the term "arm's length transaction"?

A. Yes.

Q. What does that mean as you use it?

A. Two parties not affiliated in any manner negotiating a transaction free market.

PAGE 50

Q. And was the sale-leaseback transaction between Control Data Corporation and Minnesota UTF, II an arm's length transaction?

A. Yes.

Q. After the sale-leaseback transaction had closed, was there any relationship between UTF or

Minnesota UTF and Control Data Corporation outside the agreement set forth in the lease that I marked as Exhibit 123?

A. No.

Q. What was the role of I. Reiss & Son?

A. They're a New York investment company and they made us a mortgage loan in conjunction with this property.

Q. Had you had prior dealings with I. Reiss?

A. We've had numerous dealings. Whether they were prior or subsequent, I don't recall.

Q. How did I. Reiss' -- how did I. Reiss come to have participation in the financing, do you remember?

A. We went to them and asked them if they'd like to participate.

Q. Is I. Reiss a sophisticated investor in real estate, to your knowledge?

A. To my knowledge, yes.

Q. Who's the principal of I. Reiss & Son?

PAGE 51

A. Mr. Reiss.

Q. Is it Arthur Reiss?

A. Yes.

Q. And was he involved in the financing of --

was he the principal who was involved in the financing of the Control Data headquarters?

A. All of the, all of the work was done through his counsel.

Q. Do you remember who that was?

A. Paul Powsner.

Q. Is he a real estate lawyer?

A. Yes.

Q. From?

A. New York City.

Q. Is that where Mr. Reiss is from too?

A. Yes.

Q. Are you generally familiar with Mr. Reiss' holdings?

A. No.

Q. Is he a -- does he have significant real estate holdings, do you know?

A. It's my understanding that he does, but I have no direct knowledge.

Q. Do you consider Arthur Reiss to be a sophisticated real estate investor?

PAGE 52

A. Yes.

Q. Did you at the time in 1985?

A. Yes.
Q. We saw that appraisal that was marked as Exhibit 121, I believe. And you said, I believe, that Prudential would have gotten a copy of that appraisal because that was your agreement with Prudential; right?
A. Yes.
Q. Do you know if Reiss also got a copy of that appraisal?
A. I don't know.
Q. Was that your agreement with Reiss?
A. Was what my ---
Q. That they would get a copy of the appraisal.
A. No.
Q. Did Reiss have an option to purchase the Control Data headquarters property from Minnesota UTF or UTF?
A. Yes.
Q. What was the -- was that something that Mr. Reiss had insisted on or how did that come to be?
A. It was part and parcel of the mortgage financing that he provided to us.
Q. Is that typical, a typical practice by

PAGE 53

United Trust Fund is that they would purchase a building, lease it back and then soon after sell that holding to someone else?

A. Yes.

Q. Was that the intention going in to the Control Data headquarters sale and leaseback that you would sell, sell your interest in the property sometime in the near future following the transaction?

A. Well, we hold our properties anywhere from one month to ten years typically. So sometime during that period of time we generally sell our properties.

Q. Do you recall what your intentions were with respect to the Control Data property, how long you intended to hold it?

A. Until we could get a reasonable profit.

Q. Through either the sale or the lease?

A. Correct.

MR. WELLS: Let's mark this as Exhibit 124.

(Thereupon, Nolan Exhibit 124 was marked for identification.)

Q. Do you recognize Exhibit 124?

A. Yes.

Q. This is a letter you wrote to David Yale at Prudential Insurance Company dated October 21, 1985; correct?

PAGE 54

A. Yes.

Q. In this letter you're letting Mr. Yale know that you've entered into an agreement in principal with Fortune Funding Company to sell the Control Data headquarters complex.

A. Yes.

Q. What was the connection between -- maybe you can just describe for me how the -- how United Trust Fund's sale of the Control Data headquarters building proceeded. Did you sell it to Mr. Reiss first who turned it around to Fortune Funding or how did that work?

A. You know, I can't recall, but I know that Mr. Reiss had the option, so whether he assigned his option and interest went directly to Fortune or if it went to him and then Fortune, I just -- I wouldn't know.

Q. Do you recall dealing with anybody from Fortune Funding Company?

A. No.

Q. Did you have any -- who negotiated the sale of United Trust Fund's interest in Control Data

headquarters building? Or was there any negotiation?
A. There was none.
Q. Just exercise of the option?
A. Right.
Q. So is it your recollection that Mr. Reiss
PAGE 55
just advised you that he wanted to exercise his option?
A. That's my recollection, yes.
Q. Was there a closing on this sale?
A. I'm sure there was. Not that I have any records of.
Q. Did you participate?
A. You know, I have no recollection.
Q. You yourself don't recall meeting anybody from Fortune Funding Company?
A. No. I never met anybody from Fortune Funding.
Q. Do you know who they are?
A. It was my understanding that they were an investment company from New York, forgot the name of the principal there.
Q. Olnick?
A. Robert Olnick is correct. Thank you. And never met Mr. Olnick or anyone from Fortune Funding

Corporation.

Q. Did Mr. Olnick or anybody from Fortune Funding Company request any information from United Trust Fund that you can recall?

A. No.

Q. Did they request any information on the condition of the building?

PAGE 56

A. No.

Q. Did they request any information or did they request a copy of the appraisal?

A. They never requested anything.

Q. Nothing at all?

A. Okay.

Q. Do you know if they requested any such information from Mr. Reiss?

A. I don't know.

Q. Did Mr. Reiss request any information about -- well, did he request any information in connection with his purchase and resale to Fortune Funding?

A. Not that I can recall.

Q. Can you recall Mr. Reiss ever requesting a copy of the appraisal?

A. No.

Q. Or anybody associated with Mr. Reiss?

A. No.

Q. Did Mr. Reiss ever go -- to your knowledge, did Mr. Reiss ever go to Minnesota in connection with any of the transactions involving the Control Data headquarters building?

A. Not to my knowledge.

Q. How about his lawyer, Mr. Powsner?

PAGE 57

A. Yes, I believe he did.

Q. Did he go on any of the tours of the building, do you know?

A. Not to my knowledge.

Q. He was present at the closing in Minneapolis?

A. I believe he was. But I wouldn't say he was. I believe he was.

Q. After UTF or Minnesota UTF acquired an interest in or acquired ownership of the Control Data headquarters building, did they ever -- did Mr. Reiss or his lawyer ever ask to inspect the building?

A. No.

Q. Or for any kind of tour for the building?

A. No.

Q. And I take it Fortune Funding never made such a request either because they never asked you for any information.

A. Correct.

Q. Let me ask you, Mr. Nolan, if either Mr. Reiss or Fortune Funding had made a request to tour the building or to inspect the building, was there any reason you would have turned them down?

A. No. Subject to Control Data's permission, of course.

PAGE 58

Q. In terms of reasonable time?

A. Yes.

PAGE 60

(Thereupon, Nolan Exhibit 126 was marked for identification.)

Q. The court reporter is handing you Nolan Deposition Exhibit No. 126. Would you take a look at this, please.

A. Yes.

Okay.

Q. Do you recognize Exhibit 126?

A. Yes.

Q. What is it?

A. This is the ground lease on the headquarters office building.
Q. Was there some reason why there was a separate ground lease and building lease?
A. The -- my recollection is that the sale to Reiss was a bifurcated sale in which we first sold the improvements, being the building, and then had a -- kept the land underneath the building under a lease agreement, and that lease agreement provided that Mr. Reiss could also acquire the land at some future period of time.
Q. Do you know why it was bifurcated?
A. I think it was a good tax structure for the parties.
Q. Did UTF retain an interest in the land
PAGE 61
until such time as Mr. Reiss exercised his option to purchase?
A. Yes.
Q. Do you remember when he exercised the option to purchase?
A. I don't know. The land you're talking about?
Q. The land, right.
A. No, I don't.

MR. WELLS: Thank you, Mr. Nolan. I have no further questions at this time.

BY MR. HUGHES:

Q. Mr. Nolan, I have just a couple of questions. My name is Bill Hughes. I'm the attorney for Prudential, plaintiff-intervenor in this matter. You and I met this morning very briefly.

Let me ask you first of all couple of sort of background questions on the 1985 transaction.

Was it your understanding back in 1985 that Control Data owned the headquarters building in Minneapolis that was the subject of the leaseback transaction?

A. Yes.

Q. Was it your understanding that Control Data
PAGE 62
had actually developed and built that building some 15 years before?

A. I didn't have any history -- knowledge of the history of the property.

Q. Did you have any knowledge as to whether Ceridian had been the occupant of the building for some period of time?

A. Yes, Control Data Corporation. Yes.

Q. Control Data. So you knew that Control Data had occupied the building for some period of time prior to 1985, but you're not exactly sure how long?

A. That's correct. Well, I'm not sure how long or who developed it or any of the mechanical history of the property.

Q. At that time was Control Data the sole occupant of that headquarters building?

A. Yes.

Q. You had mentioned earlier that Prudential was the lender that was going to do the financing or at least the first mortgage for the sale-leaseback. Do you recall approximately when in the process Prudential became involved?

A. Not exactly, no.

Q. Was it clear to everyone in the transaction, including Control Data, and presumably -- or

PAGE 63

including UTF and presumably Control Data that Prudential would be the bank providing the first mortgage financing?

A. I don't know what Control Data knew about Prudential.

Q. Do you remember ---

A. Or when.

Q. Do you remember there being an assignment of rents or a payment of rents agreement in the lease?
A. Yes.
Q. That the rents would be paid to Prudential directly by Control Data?
A. No, I don't remember that at all. I remember there was an assignment of rents, but I don't know if it was a direct or indirect assignment.
Q. It is your recollection that Prudential visited the Control Data building for the purposes of conducting an inspection sometime prior to closing; is that correct?
A. Yes.
Q. And that visit would have been made with the knowledge and with the permission of Control Data; is that correct?
A. Yes.
Q. Let me ask you to look back, please, at the lease agreement that was previously marked as Nolan

PAGE 64

Exhibit 123. And let me ask you to look specifically at page 02725 of that document.
A. Yes.

Q. Then I'm going to direct your attention to section 2.1, Maintenance and Repair. Do you see that at the top of the page?

A. Yes.

Q. And the first sentence reads that "Lessee acknowledges that it has received the premises in good order and repair." Do you see that?

A. Yes.

Q. The lessee was Control Data Corporation; is that correct?

A. Yes.

Q. And the premises is the headquarters building; is that correct?

A. Yes.

Q. I take it that the statements that were made to you by Control Data leading up to the closing were all consistent with the statement that "Control Data acknowledges that it has received the building in good order and repair;" is that correct?

MR. WELLS: Object to the form.

A. Could you ask the question again?

Q. To your recollection, was -- were the

PAGE 65

statements that Control Data made up to the time of the

closing consistent with this statement in the lease that "Control Data acknowledged that it had received the building in good order and repair"?

A. Well, the -- we bought the property from Control Data in the condition that it was in and they leased it in the condition it was in. You know, good order and repair, I would say that that was how we felt that the condition we bought the property was.

Q. And the statements made by Control Data to you were consistent with that statement in the lease; is that correct?

A. Yes.

Q. Let me ask you then to look at the appraisal that was previously marked as Nolan Exhibit 121. And I'm going to ask you to look specifically at page 004813 of that document.

A. Okay.

Q. Do you see the statement, Statement of Limiting Conditions at the top of that page?

A. Yes.

Q. Are you familiar with the practice of appraisers to attach a statement of limiting conditions to an appraisal?

A. Yes.

PAGE 66

Q. Let me direct your attention, please, to paragraph 10 of that statement of limiting conditions. Do you see that?

A. Yes.

Q. Let you take just a minute to read that statement.

A. Okay.

Q. You had said earlier that this appraiser, Patchin & associates, Inc., was retained by Control Data for the purposes of preparing an appraisal; is that correct?

A. Yes.

Q. And in statement 10 do you see where the appraiser that was retained by Control Data is making the statement that "The appraiser assumes that the curtain wall window unit problem and condition will be shortly resolved to the satisfaction of all parties without a major financial burden on the operation of the property"?

A. Yes.

Q. Were the statements that Ceridian or that Control Data made to you up to the time of closing all consistent with this statement?

A. Yes.

Q. Let me direct your attention to the previous page of that same exhibit. And I tell you, just

PAGE 67

to keep the record -- let me ask you this: First of all, turn back one more page to page 004811. Is this a copy of the letter from Control Data to Mr. Patchin and yourself dated July 9, 1985 that is also marked as Nolan Exhibit 120? Is that right?

Take a look at Nolan Exhibit 120. Should be a letter on Control Data letterhead.

A. Should have kept them in order.

Yes.

Q. So just for the record, let's just establish that Ceridian Exhibit 120 is an additional copy of a letter that was included in the appraisal marked as Exhibit 121. And that would start at page 004811.

A. Yes.

Q. So now let's look at Exhibit 120.

Let me ask you to look at the second full paragraph on page 2. It states, "The original contractors, suppliers, engineers"?

A. That's the -- okay, second full paragraph, go ahead.

PAGE 68

MR. HUGHES: On the second page of Nolan Exhibit 120.

Q. And then the second sentence of that paragraph reads, "The most recent procedures that has been approved by all of the above parties appears to have substantially eliminated the problem." Do you see that?

A. Yes.

Q. Do you understand that sentence to relate to the curtain wall problems and any leakage that occurred with -- that existed prior to 1985?

A. Yes.

Q. Were the statements that Control Data made to you leading up to the closing all consistent with this statement as well?

A. Yes.

Q. You had testified previously that the information you had obtained about the history of the curtain wall problem was not an issue in your estimation.

A. Correct.

Q. Do you remember that testimony?

Was that conclusion that the curtain wall condition was not an issue based upon statements such as those contained in the lease, in the appraisal report and

in this letter from Control Data, along with any other
statements from Control Data that they made that were

PAGE 69

consistent with those representations?

MR. WELLS: Just a second. I object, it's
leading, multiple and ambiguous.

A. Well, there are, I think you mentioned
three documents that took away any kind of issue or
concern. This being one of the documents. The
obligations of the tenant under the lease being the other,
yes.

Q. Was UTF ever a tenant or occupant in the
Control Data headquarters building in Minneapolis?

A. No.

Q. To your knowledge, was Prudential ever a
tenant or occupant in the Control Data headquarters
building in Minneapolis?

A. No.

Q. To your knowledge, was I. Reiss ever a
tenant or occupant of Control Data headquarters building
in Minneapolis?

A. No.

Q. As among UTF, Prudential, I. Reiss and
Control Data, who do you think was in the best position to

have detailed knowledge about the condition of the building and the curtain wall system prior to the closing in 1985?

MR. WELLS: Objection, leading.

PAGE 70

A. Does that mean you'd like me to answer it?

Q. Yes.

A. Okay. Control Data Corporation.

Q. Do you recall there being any discussion concerning -- strike that.

Last week I was trying to remember the name of a fellow who was a friend of mine back in the early '80's who had moved to Miami and I didn't remember it until I was flying down on the airplane this morning. I know that you've answered the questions today to the best of your recollection, but given that this is a transaction that occurred 15 or 16 years ago, is it possible that you may recall additional information or details as time goes by and you think about this more?

MR. WELLS: Objection, calls for speculation.

A. I don't really think so. I mean, if you ask a particular question, other than that, it would have -- I'm not going to be thinking about this

transaction.

MR. HUGHES: I don't have anything more right now.

MR. SUSAG: Mr. Nolan, good morning.

THE WITNESS: Good morning.

PAGE 71

CROSS-EXAMINATION

BY MR. SUSAG:

Q. My names is James Susag. I represent the plaintiff in this matter, Fortune Funding. I'm an attorney that practices in Bloomington which is a suburb in south Minneapolis, and, in fact, is the same city in which the Control Data building is located.

You testified when we were talking about your general background that you had participated in more than 100 acquisitions of commercial real estate, and the question I had was how many are those or what would be the percentage of sale-leasebacks of that over 100?

A. Almost all.

Q. You testified that you made possibly three, maybe more visits to Minneapolis in connection with the sale-leaseback of the Control Data building. Do you

PAGE 72

remember that testimony?

A. Yes.

Q. Did anyone accompany -- let me back up. You said that you believe, although you're not sure, that Sidney Domb may have accompanied you on one of those trips.

A. Yes.

Q. Did anyone else from UTF or Minnesota UTF accompany you on those trips?

A. No.

Q. Besides ---

A. Not to my knowledge.

Q. Besides yourself and Mr. Domb, who else at Minnesota UTF or UTF was involved in this transaction?

A. My recollection is it was I did just about everything on this transaction. With the exception of what the lawyers did.

Q. So you had more of a role than Mr. Domb did?

A. Oh, absolutely.

Q. I don't know if this question was asked, but I just want to follow up.

During those visits you made to Minneapolis, you said you had met with some folks from

Control Data.

PAGE 73

A. Yes.

Q. Do you recall the names of any of those folks you may have met with?

A. I have no recollection of the actual names of the people, but if you were to say, "Did you meet with a certain name" and refresh my memory, maybe I would be able to say yes.

PAGE 74

Q. I want to turn, Mr. Nolan, if you will, back to Exhibit 123. That's the lease agreement.

A. Yes.

Q. While you're turning to that I want to turn to Exhibit 119 which is a letter dated June 17, 1985 from yourself to David Yale.

A. Yes.

Q. If you'd turn to the second paragraph of the June 17, 1985 letter, Exhibit 119.

A. Yes.

Q. It says, "The final lease agreement" --

PAGE 75

about midway through that second paragraph. Says, "The final lease agreement will be concluded this week and the changes which have been agreed to are not material to our financing." Do you see that?

A. Yes.

Q. Looking at that letter and looking at Exhibit 123, the lease agreement, can you recall for me and describe the negotiations that led to the execution of this lease document, Exhibit 123?

A. My recollection is that when we presented the contract, the lease agreement was attached to the contract and Control Data's counsel had some comments with respect to -- this is what we call our form lease document. And those changes which they asked for we made.

Q. So Exhibit 123 is the lease agreement that was ultimately executed. The form of the agreement, was that a UTF form?

A. Yes.

Q. It was not a Control Data form?

A. No.

Q. And Control Data, as I understand your testimony, had an opportunity to comment and review on this lease?

A. Yes.

Q. And, in fact, did that?

PAGE 76

A. Yes.

Q. And suggested changes?

A. Yes.
Q. And, in fact, changes were made based upon their comments?
A. Yes.
Q. And they had -- Control Data had counsel representing them in connection with this matter?
A. Yes.
Q. Do you recall anything else concerning the lease negotiations themselves?
A. No.
Q. And by that I mean, were they particularly easy or were they particularly difficult, anything?
A. No.
Q. We talked about the time line. You said, in looking back at Exhibit 119, you had said that your best estimate was two or three months before this letter that you or that UTF had become involved in the transaction; is that right?
A. Yes. Not longer than that I said.
Q. The property was sold ultimately to Fortune Funding at the end of 1985; is that your understanding?
A. I don't have an understanding outside of the documents here.

PAGE 77

Q. Let me ask it this way: Since UTF sold the property in 1985, have you had any dealings with it since that time?

A. No.

Q. Havc you had any -- UTF now or Minnesota UTF, havc you had any dealings with Control Data?

A. No.

Q. Or Ceridian Corporation?

A. I'd like to take that back. We did bid on Ceridian's new corporate headquarters under a sale-leaseback scenario, I would say, about a year ago or so.

Q. How did that come about?

A. Broker showed us the transaction.

Q. And you made a bid on that deal?

A. Yes.

Q. Were you successful?

A. No.

Q. Mr. Nolan, just one more question on the lease agreement, Exhibit 123.

Mr. Wells asked you about arm's length transactions and you stated that you knew the definition of that and you provided a definition of that. In your

opinion and your experience with this transaction, was the
negotiation and execution of Exhibit 123, the lease

PAGE 78

agreement, was that as a result of an arm's length
transaction?

A. Yes.

Q. Mr. Nolan, I want to briefly ask you about
sale-leasebacks in general. Okay?

You said you have extensive experience with
it, you talked about that this morning. As I understand
it from the literature we've gone through this morning,
the promotional materials that we've gone through, a
sale-leaseback can be used as a financing tool for a
corporation to free up some cash that's otherwise stored
in the real estate to be used for other things; is that
right?

A. Yes.

Q. Simplified obviously. I mean, that's kind
of a simple description of a sale-leaseback?

A. Yes.

Q. When you are examining a sale-leaseback
transaction to determine whether UTF wants to engage in
that transaction, what are the things you're looking for
in terms of background? What are the things that are

important to you and to UTF?

A. The first thing that we look for is the credit of the company who we would be doing business with. Typically we're talking about public companies who have

PAGE 79

revenues of 500 million dollars or more and stockholders' equity of 100 million dollars. Those are the companies that get our attention. Although we can do other things too, but that would be the 90 percent core business.

The next thing we look at is the real estate.

Q. So you look at the financial strength of the company and then you look at the real estate itself?

A. Correct.

Q. Is it important in a sale-leaseback transaction to have a net lease?

A. Yes. For us.

Q. Why is that?

A. We're very passive in our approach to real estate and the net lease is a passive investment.

Q. What do you mean by "passive," by a "passive investment"?

A. A situation in which we have no responsibilities with respect to the real estate. For

example, maintenance, repair, taxes, insurance, that sort of thing.

Q. Who has the responsibility if you don't?

A. The tenant under the lease.

Q. And in this case, who had -- in this transaction that's the subject matter of this lawsuit, who

PAGE 80

had that responsibility?

A. Control Data Corporation.

Q. Did UTF have any responsibility in terms of repair and maintenance?

A. No.

Q. Did UTF or Minnesota UTF have any responsibilities with the property at all?

MR. WELLS: Object to the form. It's vague and speaks for itself. You can go ahead.

A. The net lease that's on the table here really, in my opinion, provides that the tenant does everything with respect to the property.

PAGE 82

Q. Let's turn back to that lease again, Exhibit 123.

Mr. Hughes asked you some questions about the language that appears in Article II, Section 2.1, Maintenance and Repair on page 5. If you look at the

little numbers in the right-hand corner it's 2725. Do you see that?

A. Yes.

Q. I take it you're familiar with standard -- with UTF's standard form lease agreements?

A. Yes.

Q. Is what's contained in 2.1 (a), is that UTF's standard form lease language?

A. Yes.

MR. HUGHES: If you want a chance to review it.

Q. Take ---

A. Minus a comma or period or something like that, that's our standard language.

Q. In a nutshell, Section 2.1 says that "The lessee at its own expense will maintain all parts of the premises in good repair and condition except for ordinary wear and tear and will take all action and will make all

PAGE 83

structural and non-structural foreseen and unforeseen and ordinary, extraordinary repairs which may be required to keep all parts of the premises in good repair and condition." Then there's a series in parentheses. And then it continues, "In as good a condition as they existed

at the beginning of the primary term." That's the beginning of the -- that's the date of the lease; right?

A. Yes.

Q. "Ordinary wear and tear excepted;" right? Right?

A. Yes.

Q. And you understood when you entered into this lease that UTF was not entitled either during the lease or at the end of a lease to a building that was in a better condition than it was in at the beginning of the lease term; right?

A. Yes.

Q. Would you turn to page -- I'll give you these control numbers down in the lower right-hand corner -- 2756, PRUD 2756.

A. Yes.

Q. There's a Section 9.4 and that's entitled Separability and Binding Effect.

A. Yes.

Q. Again, is this the standard lease language

PAGE 84

that appears in the UTF standard leases?

A. It was in 1985.

Q. Down at the bottom it says, "This lease

together with the purchase agreement." Do you see that line?

A. Yes.

Q. I'll quote it. It says, "This lease together with the purchase agreement and all other documents executed and delivered simultaneously with the delivery hereof." That would be the documents in the closing books; right?

A. It might refer to some of the documents in the closing book.

Q. Some, maybe not all.

A. Correct.

Q. But it says that "The lease together with the purchase agreement and all other documents executed and delivered simultaneously with the delivery hereof constitute the entire understanding between the parties with respect to the premises." Do you see that?

A. Yes.

Q. That was your understanding too; correct?

A. Yes.

Q. In other words, that the lease agreement and the other documents that are -- that were part of the

PAGE 85

closing transaction were the -- constituted all the

agreements between Control Data and Minnesota UTF and UTF; correct?

A. All the written agreements, yes.

Q. There weren't any other agreements outside the written agreements that were part of the closing transaction?

A. Not to my knowledge.

Q. Let me ask you one more question about standard lease language.

Would you look at page 2721. You see there's Article I, Section 1.1, it's entitled Lease of Premises, Title and Condition. Do you see that?

A. Yes.

Q. Is that the UTF standard lease language?

A. It was.

MR. HUGHES: If you know.

THE WITNESS: It was as of 1985, yes.

Q. I just have one more question and this one is about the appraisal that's Exhibit 121.

If you'd turn to the control No. CER 4813. This is the Statement of Limiting Conditions that Mr. Hughes asked you some questions about.

A. Yes.

Q. Again, I'm going to direct your attention
PAGE 86
to paragraph No. 10. Do you see that?
A. Yes.
Q. This paragraph says that "The appraisers are aware of the July 1995 letter." That's the letter from Mr. Darr to you and others; correct?
A. Yes.
Q. And it says, "And the appraisers assume that the condition will shortly be resolved to the satisfaction of all parties."
My question is, did you, did you do anything to test that assumption?
A. No.
Q. Was there any, anything that prevented you from testing that assumption, to your knowledge?
A. No.
PAGE 89
Q. Let me just ask you, Mr. Nolan, on the topic of this lease. Would you take a look at the lease and look at Section 2.1 again, please. The control number on the bottom of the page is 2725.
A. Yes.
Q. How many times do you think you've seen the standard UTF lease language relating to maintenance and