Q. Again, I'm going to direct your attention
PAGE 86
to paragraph No. 10. Do you see that?

A. Yes.

Q. This paragraph says that "The appraisers are aware of the July 1995 letter." That's the letter from Mr. Darr to you and others; correct?

A. Yes.

Q. And it says, "And the appraisers assume that the condition will shortly be resolved to the satisfaction of all parties."

My question is, did you, did you do anything to test that assumption?

A. No.

Q. Was there any, anything that prevented you from testing that assumption, to your knowledge?

A. No.
PAGE 89
Q. Let me just ask you, Mr. Nolan, on the topic of this lease. Would you take a look at the lease and look at Section 2.1 again, please. The control number on the bottom of the page is 2725.

A. Yes.

Q. How many times do you think you've seen the standard UTF lease language relating to maintenance and

repair? Hundreds?
A. Quite a few times, yes.
Q. Reading through the Section 2.1 (a) on that page, can you tell me whether any of the language in that section is different than the standard language?
MR. HUGHES: Object to the question, requires speculation and a statement of opinion.
A. But I might answer as follows: You know, this document was a document that evolved over, from, you
PAGE 90
know, 1972 to 1985 and we continuously incorporate new changes as happen over a period of time. So this was the standard form that we used in 1985. Our form today is substantially different than this but the concept is basically the same.
Q. But Section 2.1 (a), was that the standard form that UTF used in 1985? And by all means, take a minute and look through it and make sure you satisfy yourself.
MR. HUGHES: And I'm going to object to the question again, it's asking this witness to speculate without benefit of having the draft that UTF was using in 1985 that it would have presented to Control Data without benefit of having Control Data's comments back and without

benefit of being able to determine exactly what may have
been added as a result of comments by Control Data.
MR. SUSAG: I join in that objection.
Q. You can answer.
A. Would you repeat the question, please?
MR. WELLS: If I remember it. Would you
read the question back.
(Question read.)
THE WITNESS: With the exception of a comma
or a period or this or that, this is basically the
standard language that we submitted.

PAGE 91

Q. Looking through this, do you have any
recollection that any of, any of the language that's used
in Section 2.1 (a) was language that was requested by
Control Data?
A. I have no knowledge.
Q. With respect to Section 1.1 that's on page
2721, how many times had you seen the standard lease
language that was used in the 1985 time frame relating to
Lease of Premises, Title and Condition?
A. Numerous times.
Q. Have you had a chance to read through that?
I don't want to rush you.

A. Section 1.1?

Q. Right.

A. Absent a comma or period here or there, that's our standard language.

Q. Reading through that, is any of -- is any of that, any of thc language that appears in Section 1.1 language that was requested by Control Data?

A. I would have no knowledge of that.

Q. You don't recognize any though, do you?

A. No.

**Roland Cauldwell Designations**

PAGE 4

Q. Would you state your name for the record?

A. My name is Roland Cauldwell.

PAGE 5

Q. Let me tell you that at the outset, this case involves some real property located in Bloomington, it's the old Ceridian headquarters building. It's located -- the tower at 8100, and there's some mod buildings there, too. So when I refer to the property or the headquarters, the tower, the mods, are you going to understand what I'm talking about?

A. Indeed, I will.

PAGE 6

Q. Could you give me your address?

A. I reside at 8811 200th Street Court East in Spanaway.

Q. What is your age?

A. I'm 62.

Q. Are you married?

A. Yes, I am.

Exhibit B

Q. Why don't you tell me about your educational background; where did you go to college?

A. I went to school at Fort Hayes Kansas State College, in Hayes, Kansas. It's a state school and received my Bachelors degree in economics in January 1961, and went from there to Arizona State University and worked on my Masters, which was interrupted by military service. And then I returned after my service and finished my Masters.

PAGE 7

Q. When did you finish your Masters?

A. 1965.

Q. Was that also a Masters in Economics?

A. That's correct.

Q. Have you had any other training or education?

A. A lot of classes, but individual classes, no formal education.

Q. Do you hold any licenses?

A. At the moment, I don't think so. I did hold a Minnesota real estate brokers license.

That probably expired some time last year.

PAGE 8

Q. When you first graduated, gotten your Masters in '65, what was your first job out of school?

A. I went to work for Control Data Corporation in Palo Alto, California.

Q. Was that 1965?

A. That's correct.

Q. What was that original position?

A. I was a department called facility administration. You would think of it as being property management.

Q. And you said that was in Palo Alto?

A. That's correct.

Q. What properties were you managing; was it properties in California?

A. Oh, yes. There were -- it was only in the immediate vicinity of Palo Alto, in other words, buildings in Palo Alto and in Mountain View and Cupertino.

PAGE 9

Q. What were your duties in that position?

A. The first year or so that I was there, I was a buyer primarily, although I did other things having to do with maintenance of the buildings and mail delivery and shipping and receiving and that kind of thing.
Q. When you say, "buyer", buying real property?
A. No, I was buying what they call a MRO buyer supplies.
Q. At some point did you get transferred or some how move to the Bloomington office?
A. Yes.
Q. When was that?
A. That was in 1969.
Q. What was your position at the time that you were --
A. I went there as a real estate analyst.
Q. And what duties did that involve?
A. What a real estate analyst did was work on real estate projects for the corporation. When a project was -- had been approved by the appropriate level, then we would implement whatever the appropriate solution would be,

perhaps, the purchase of some land or the sale

PAGE 10

of a building or lease of some office space or
whatever it was.
Q. Were you involved at all with the
construction of the headquarters building?
A. No.
Q. At some point did you become the
director of the real estate department?
A. Yes, after I had worked as an analyst
for about two years, I was given the job as
manager of the real estate department.
Q. Was your title director of the
department or general manager of the department?
A. At the time I received the promotion to
manager, it was manager. It later became a
somewhat larger department and with greater
responsibilities, and I was promoted to director
of real estate.
Q. When did you become manager?
A. That would have been 1971.

PAGE 11

Q. And when did you become director?

A. Probably -- it would have been the late 70's, '78, plus or minus, I suppose.
Q. Did you ever hold a different position as general manager of the real estate department?
A. Yes, I did. I was promoted to a general manager's slot, but at that point I had more than just the real estate department reporting to me. I had other functions.
Q. When was that?
A. I'm going to say 1980, once again, plus or minus a year.
Q. As director of the real estate department, let me strike that. What was the role of the real estate department?
A. The real estate department implemented real estate projects when something needed to be done with adding facilities or subtracting facilities. And it seemed like that was always happening, one or the other. Then the real estate department would be charged with the responsibility to see to it that it happened.
Q. Was that department involved with any issues of repair or maintenance or improvement of

the real property?

PAGE 12

A. No.
Q. Was that something solely in the facilities aspect?
A. It would either have been in the facilities group or it would have been -- that responsibility would have been lodged with the primary occupying group, since we're talking about the tower and mods, it would have been the facilities group, yes.
Q. When you were director of the real estate department, what did your duties involve at that time?
A. I had several real estate analysts reporting to me, varying numbers, depending on where Control Data was in their business cycle. Sometimes as few as three or four and as many as eight or ten. Those analysts would be charged with individual projects.
They would often work on -- well, usually they would be working on ten or twelve projects at a time, bringing them to a

conclusion, whatever that conclusion may have
been for their different projects, selling some
unneeded properties, adding some other properties
that needed to be added to, finding new office

PAGE 13

space for a new function; obtaining an easement
for something.
Q. Would you be involved with getting
permits, zoning approvals?
A. Yes.
Q. Who was your supervisor when you were
director?
A. I worked for Pat Conway.

PAGE 18

Q. When did you leave Control Data?
A. Early 1989, March.
Q. What was the reason for your leaving,
was there a reorganization at that time?
A. There were -- Control Data was in
serious reorganization at that time. And my job
had shrunk out from under me and had been
shrinking out from under me for six months, and

PAGE 20

Q. I would like to talk a little bit generally about the real estate property opened by Control Data, and let's start in 1970. Can you give me an estimation, let's say, in square feet of how much facilities property they owned?
A. Well, they were occupying probably close to ten million square feet, somewhere less than that. The portion that they owned at that time would have been, I don't know, but I would guess two or three million.
Q. Is it possible that it was five million?
A. Possibly. Oh, I doubt it.
Q. From 1970 to 1984, was there a change in the amount of property real owned by Control Data?
A. Yes, it was growing.
Q. Why was that?
A. We had various groups that were growing. We went eventually in the mid 80's, I think, we had gone up to 40,000 employees. We had certainly been a lot smaller than that in 1970. And the amount of space you need is pretty much a function of the employees that you have.

PAGE 21

It's certainly also a function of the use that you're putting it to, and if we're mostly a warehouse operation, then it's a function of the line items that you have and the product and size and that. But in our case, it was mostly a function of employees.

Q. As far as square footage, again, property owned by CDC, Control Data, would it be fair to say it was about 15 million, maybe in -- that it peaked at about 15 million?

MR. DEIKE: Just in general.

BY MR. DEIKE:

Q. In the period '70 to '84, when it reached its apex?

A. By the mid 80's, when it reached its apex, I don't know that we ever got to 15 million, but it would have been approaching that, I bet. But you said that we owned, that's how much we occupied. We owned only a portion of that.

Q. Okay.
A. At that point it would have been five million square feet, or perhaps, even more.

PAGE 22

Q. Could you give me an estimate of the approximate value of the real property owned by Control Data at -- in about 1984? Would you say it's greater than a hundred million?
A. Yes, but not a great deal more than a hundred million, less than a hundred and fifty million.
Q. Could you give me an estimate on the number of separate properties owned in '84?
A. Oh, perhaps, oh, owned properties, 50.
Q. Staying in 1984, do you recall what the financial condition of Control Data was?
A. I don't -- I remember Control Data had excellent financial condition, and then they would be in bad financial condition, and to pin it to even a year, I'm unable to do that.

Q. I'm showing you what's been marked as Exhibit 239. You'll notice on the bottom right-hand corner with all these documents there

PAGE 23

are going to be some numbers, and they are -- the lawyers and us call them Bates numbers. This one starts at PRUD O4221. And if you look to the last page, it ends with PRUD, and you can't read it, but from the page before, you understand that it's PRUD 04230.

Would you just take a quick look at that? You don't need to read it, just --

A. It appears to be pages from the 1984 Annual Report.

Q. And do you recognize it?

A. No. It appears to be the 1984 Annual

PAGE 24

Q. Let me have you turn to, I believe it's the third page, but it's PRUD 04223. And if you take a look at that, would that appear to show a significant decrease in earnings from 1983 to 1984?

PAGE 25

A. Reading the numbers, indeed, it shows a significant decrease in earnings per share and in net earnings.

Q. Do you have any personal recollection of why in 1984, had that significant decrease?

A. No, I don't.

Q. Let me have you turn to the last page, too, it's PRUD 04230, and like I said, the number is blocked out on the bottom. The second paragraph under where it says, financial condition, it says that during 1984 total debt of the parent company increased by 224.5 million to 747.5 million after declining by 30.3 million and 23 million in '83 and'82. That would indicate a significant increase in debt; isn't that correct?

A. It would appear to be a significant increase in debt, sure.

PAGE 26

Q. Do you recall whether in 1984, Ceridian or Control Data had a cash flow problem?

A. No.

Q. I assume, are you familiar with the term sale leaseback?

A. Yes, I am.

Q. What's your understanding of the mechanics of the sale leaseback transaction?

A. In broad brush strokes, the property that an individual or a company owns is sold to most likely an investment group, and in turn, leases it back from that group for some term, under whatever conditions are put into the lease agreement

PAGE 27

Q. I mean, in effect, for the property owner, it would take the value of the property and turn it into operating cash; isn't that right?

A. That's correct. Well, that's one of the things it does, yes.
Q. How many sale leasebacks have you been involved in in your career?
A. I would have to guess. I would say it's less than ten, more than a couple.
Q. Okay.
A. I can only come up with two right offhand, but I'm sure there were more than that.
Q. Typically, in a sale leaseback situation, who is responsible for the upkeep of property during the lease?
A. The party responsible for upkeep of the property is subject to whatever it says in the lease, but what the lease typically says is the tenant will maintain the property.

PAGE 28

Q. This would be the person, the entity that sold the property and leased it back?
A. That's correct.
Q. At some point did Control Data consider

utilizing sale leaseback transactions with respect
to some of its properties?
A. Yes.
Q. Do you recall when that was?
A. We considered it often through the
years, but with regard specifically to the tower
and mods, I don't know how long it was under
consideration before I received word that we
should start implementing a sale of leaseback
project. I would have gotten word on it only a
few months or weeks even before we actually
implemented it.
Q. Do you recall the reason for deciding to
do a sale leaseback with respect to the tower
and mods and any of the other properties?
A. It would be speculation on my part. I
was not the one who decided to do it. I was
the one who implemented the decision, but, well,
I don't know.

PAGE 29

BY MR. DEIKE:

Q. Were you involved in any of the decision-making process in that regard?
A. With regard to deciding, here's what we're going to do, no. I would have provided information to those people who were deciding.
Q. Who would those people have been?
A. That would have been the treasurer of CFO, the CEO.

PAGE 30

Q. Were you ever familiar with the term, and I'm not sure that "term" is really the right word, but the phrase cash stash?
A. Yeah, I mean, yes. That was one of the -- one of the reports that I made on an annual or sometimes more frequent basis to the CEO regarding where we stood with facilities, what we had, we were using, what we had access; what the plans were at various sites, not in the minutia of detail, but at least a broad stroke basis. And one of the slides in that report would be a cash stash that I would put together, which would have looked a lot like -- this is a different use, but it would have

PAGE 31

included those facilities and probably some others with an approximation of value, what their book value was, and that kind of thing; showing the operating groups and the CEO and CFO where there was some available cash that could be had.

Q. Meaning, if they sold the properties, the cash they would have?

A. It was given to them as part of the staff work that I would do to allow them to make decisions, if indeed they needed some cash flow, they knew there was some there.

Q. Let me direct your attention to -- there's an underline sale and leaseback, and then it mentions in that first paragraph, you, presumably, Pat Conway, should come up with a priority list for approval of individual sale leasebacks. Were you involved and privy to the priority list?

A. I'm sure I would have been, but I don't recall. I don't recall this memo. I don't know that I ever saw it.

Q. Do you recall where the headquarters

complex fell within the priority of potential sale leasebacks?

PAGE 32

A. The headquarters complex would have represented a significant sum of money, that if they were looking for a significant sum of money, that would have been one of the projects that their eye would have been guided to.

Q. And as you said, they did ultimately decide to do a sale leaseback transaction with the headquarters; right?

A. That's correct.

Q. You testified that you learned of that decision maybe a few months before the actual transaction occurred; is that right?

A. I should have said a few weeks or months, I don't know how long it was.

Q. Do you recall how you learned of the decision to go ahead?

A. No. Most likely, I would have been visited by my supervisor who would have told me

that.

Q. Now, on the part of Control Data, who was involved with the actual sale leaseback transaction?

A. Well, I was certainly. The treasurer's office was involved in the transaction.

PAGE 33

Q. Who in the treasurer's office?

A. The gentlemen who would have had primary responsibility there was Dave Dummer, D-u-m-m-e-r.

Q. Why don't you tell me about what your responsibilities were with respect to the transaction?

A. I put together a -- well, I should say what I would have done, because I don't recall specifically doing anything, but what would have been typical would have been to have put together a package, a real estate package,

PAGE 34

describing what it was that we were selling, attaching plans, both the sketches, eight and a half by eleven sketches as well as scaled drawings, and whatever other specification sheets

I could put together for the properties we were interested in selling and leasing back and making a package that people would understand what it was we were selling, what they would be buying, what we would leaseback from them.

Then also putting together the general terms of the transaction that we would be willing to enter into, how long a lease we might entertain, what kind of renewal options we would require; other terms that might be desirable to us. So that any opposer could make a reasonable proposal to us and it would be in the same -- same format, same type of proposal as would other proposers make, so we could compare them.

The treasurer's office was charged with coming up with the -- the potential bidders, if you will.

Q. So you didn't hire an outside broker?

A. No.

Q. Now, it would seem to me based on what

PAGE 35

you have told me about your job that you would

be the person looking for prospective buyers, but that's not true?

A. I would have been, had we not been leasing it back, but because we were involved in the sale leaseback, most of those investors, the people who wanted to do sale and leaseback, instead of talking to the real estate department, they would talk to the treasurer's office. So the treasurer's office maintained the current files, if any, but knew who the people were that wanted to entertain the sale and leaseback transaction.

If I had had any thoughts as to someone who should have been included, I certainly would have told them. It wasn't exclusive territory, but they were charged with the primary responsibility to come up with the prospective bidders.

Q. And would it be Dave Dummer, would he have been the person that had knowledge of those buyers?

A. Yes.

Q. Besides the entity that ultimately

purchased the property, were you aware of the

PAGE 36

number of interested buyers?

A. Yes, because I entertained the prospective purchasers at a meeting that was attended by those prospective people, and the treasurer's office, most likely Dave Dummer, and myself. We invited them around a table, gave them the packages that I had put together so they would know what it was we were selling, and we explained to them what the process was that we were going to go through and gave them all tours of the property.

Q. This was a meeting?

A. And –

Q. I'm sorry. Go ahead.

A. And to answer your question, you had asked how many, I don't remember now, but there would have been, I suppose, at least three or four at that time.

Q. So all three or four were at this meeting at the same time?

A. That's correct.

Q. Did you personally take them on this tour of the building?
A. Oh, yes. When I said the three or four were all there, I don't remember that, but

PAGE 37

that would have been the way we would have attempted to do it. If one of them couldn't make it and came the next day, then that wouldn't shock me. And point of fact, I know that UTF fund was not at that initial meeting. They came in later.
Q. They were not. I'm going to get into this a little more specifically later, but were you aware at that time that there were some problems with the curtain wall system leaking?
A. Yes.
Q. Do you recall if you mentioned that problem to this group of buyers that were at this tour?
A. I don't remember the meeting at all.

PAGE 38

Q. Now, you have mentioned United Trust Fund or UTF, and as you understand it, they are

the ones that ultimately bought and leased back the headquarters building; correct?
A. Yes.
Q. Do you recall where they were located, their offices?
A. Miami.
Q. Now, you said that they weren't at this first meeting that you took the prospective bidders on a tour, do you remember when your first contact was with UTF?

PAGE 39

A. Through the treasurer's office. They let me know that there was another party that they wanted to put on the bidder's list.
Q. Did you have contact with anybody over at UTF at that early stage at least?
A. I'm sure they would have called and set up a time when they could go through. I would have heard first from the treasurer's office. We would have discussed it, and I would have agreed that we had adequate time, there's no reason to shut off of the bidding, and we would have set it up at that point. I don't remember

any of that, but that's what would have happened.

Q. So if they came in for a tour of the building, you would have been the person to take them on that tour?

A. Yes, indeed.

Q. Do you recall doing that specifically?

A. No.

Q. Do you recall Mr. James Nolan?

A. The name is familiar, but I suspect I wouldn't recognize him. I don't know.

Q. How about Sidney Dobb?

A. Nope.

PAGE 40

Q. Do you recall any conversations you had, if any, with UTF?

A. Not anything specific, no.

Q. Do you recall how many times you had contact with them; would it have been more than ten?

A. I suspect so, but I don't remember any of it. But it certainly would have seemed unusual to me at the time had there not been --

been there over a period of two or three days looking at one thing or another and talking to various people in the city and talking to other people within the organization, and then following up with calls and sending lease samples and finding attorneys and sitting down with our attorney and me to go over the terms of a document and attempt to decipher what some of their proposal had been. I don't remember a single one of those things, but it would have been shocking to me if all that didn't happen.

Q. Okay. Were you involved in, and I think you already indicated you were, but were you involved in the negotiation of the purchase agreement?

A. Sure. Do I remember it? No. Was I

PAGE 41

involved in it? I had to have been. I was the one who would have been involved and the attorney.

Q. So you don't have any recollection of any of the negotiation process after the execution of the purchase agreement?

A. No.
Q. Do you remember if there were drafts of the purchase agreement prior to signing it?
A. I don't remember that, but there had to have been.
(Whereupon, an Agreement of Purchase and Sale was marked as Exhibit 240 for identification.)
BY MR. DEIKE:
Q. I'm going to show you what's been marked as Exhibit 240. And if you'd just look at the first page, it's Bates numbered CER 004069 and it goes through CER 004130. If you look at the first page, can you tell me what this document is?
A. It says that it's an agreement purchase and sale between United Trust Fund, Inc., and Control Data Corporation dated the 19th day of June 1985.

PAGE 42

Q. I'll have you turn to CER 004083. Can you tell me who executed that on behalf of Control Data?

A. Mr. Rogers, Marv Rogers, executive president and chief financial officer. That's my writing.

Q. That's your writing. Okay. You mean, the title blank?

A. Not the signature, no.

Q. Who -- can you tell me who would have reviewed this document prior to signing it on behalf of Control Data?

BY MR. DEIKE:

Q. If you know.

A. The gentlemen that I mentioned a while ago, the in-house attorney that I worked with with regard to this transaction whose name I cannot recall. He was not an attorney who I worked with often.

Q. And Mr. Rogers presumably reviewed it?

A. Mr. Rogers would have relied upon his counsel to review the document. He would have relied upon me to summarize for him the terms,

PAGE 43

and he would have recognized it as being what
he had asked to have done, and he signed it. I
doubt he would have read the document.
Q. And you obviously reviewed it?
A. Certainly.
Q. Were you present when it was signed?
A. No, I usually wasn't. I don't remember
either being there or not being there, but it
would have been unlikely that I was there.
Typically, they were sent to the various offices
of people who needed to sign off on the
document, and it would eventually wind up to who

PAGE 44

was going to execute it, and they would initial
approval and sign and execute the document.
This one probably received quick routing. By
that, I mean, it probably didn't take several
days to sit on people's desks. It was a high
priority, lots of money.
Q. That was the reason it was high
priority, because it would have provided a lot
of cash?
A. When I said, high priority, that's the

way they would have treated it because it was such a large project.

Q. I'll have you turn to 4084, and if you take a look at that, it says, parcel one and parcel two. Can you tell me what those two parcels are?

A. Parcel one is describing the four-building headquarters complex in site consisting of 861,000 gross square feet. That would have been both the tower, excuse me, and mods A, B, and C. Parcel two was a two building Minnetonka Corporate Center complex, which was a complex under construction at that time.

Q. Parcel one though was the headquarters

PAGE 45

complex that we're talking about?

A. That's correct. Parcel two was part of the overall transaction, but separate. Separate in geography, different city, different type of building.

Q. Why don't I stop you, Mr. Cauldwell. Maybe if I ask you a question, you won't need

to look at that. I have a feeling you might need it to refresh your recollection. Can you tell me what the purchase price was for the tower headquarters?

A. Yes, we had estimated it to be 44 million dollars. That's why it was written into

PAGE 46

the contract as 44 million. But we had a method by which that could vary based on the appraisal that we had ordered and was under way but had not yet been completed, and we hadn't received it, of course.

Q. How would that work, that adjustment?

A. I would have to read this to tell you specifically, but I recall that we -- it was a sliding basis, so that if the appraisal was different than 44 million, the buyer would pay what the appraisal was, except the buyer had the right to escape from the contract or not pay more than some certain amount, maybe 48 million or whatever the number was. I don't recall if we had the right to escape if it was less than some amount or not. I would have to read to

find out.

Q. But your understanding was potentially if it was a lower than 44, if the appraisal was less than 44 million dollars, the purchase price would be lower than 44 million dollars?

A. I don't recall that. I would have to read and find out.

Q. Why don't you take a look at Section 2 (b), maybe that will help you.

PAGE 47

A. So we had a down side of 38 million dollars in accordance with Section 2 (b), and an up side of 46 million 200 thousand dollars.

Q. So if an appraisal came back at 38 million dollars, that would be the purchase price?

A. Yes.

Q. Less than 38 million, Control Data could get out of it?

A. I haven't gotten that far, but that's probably how it was worded.

Q. Let me have you turn to Page 5 of the agreement. It's Bates number CER 004073. And

Paragraph 6 says, "Conditions of Closing." And then at the final paragraph on the page, it talks about the requirement of entering into a lease in the form attached as Exhibit C. Do you recall what the purpose of that provision was?

A. Certainly, this was a sale leaseback agreement and this simply specified that we were going to use the lease agreement that's attached and that lease be executed and delivered at the closing of the property.

PAGE 48

BY MR. DEIKE:

Q. Why don't you turn to that Exhibit C. It starts at CER 004086. Would this be the lease form referred to in that prior paragraph?

A. Yes.

Q. Were you involved in the negotiations of the lease?

A. Yes.

Q. I'm showing you what's been marked as

PAGE 49

241, it's Bates numbers PRUD 03739 to PRUD 3744. Would you take a look at the first two pages of that document? Now, this is a letter dated June 20th, 1985, to you from Peter Patchin and Maxwell Ramsland?

A. That's correct.

Q. Who are Mr. Patchin and Mr. Ramsland?

A. They are both appraisers in the State of Minnesota. Peter Patchin was an appraiser that Control Data Corporation and I used often when we wanted a professional appraisal done of properties in and around Minnesota. Mr. Ramsland was a professional associate of Mr. Patchin and operated his appraisal firm in the City of Duluth, Minnesota.

Q. Did these two gentlemen work together in -- they were separate, but were they working together in some way?

A. They were on this project. And I do not recall precisely how that occurred.

Q. Okay. The first sentence refers to your request for a preliminary opinion of value on the above referenced property. Does -- this is

referring to the headquarters complex?

A. That's correct.

PAGE 50

Q. Would you have requested it prior to or after the execution of this purchase agreement on the 19th?

A. The purchase agreement was executed on the 19th of June; is that right?

Q. It was dated the 19th.

A. I would have requested this prior to that because they couldn't have accomplished this preliminary evaluation in a day, so in fact, I would guess it would take at least a month.

Q. Why did you request a preliminary opinion rather than just an appraisal?

A. I don't know. It would be pure speculation on my part.

Q. Was that something that you normally did when you were seeking appraisal?

A. No.

Q. Did you contact any other appraisals for a preliminary opinion?

A. No.

Q. You recall that you didn't contact anyone else?

PAGE 51

A. I would not have done so. I don't recall contacting anyone else. So the answer is I don't recall contacting anyone else. I'm sure I didn't.

Q. And as we discussed earlier, the price of the -- the sale price of the sale leaseback transaction would be adjusted based on the appraisal value; right?

A. That's correct.

Q. Between Control Data and UTF, who got to choose who the appraiser was?

A. I don't -- I don't recall what the mechanism was that we used to choose the appraiser. I don't have any memory of it.

Q. And you did say that you had worked with Peter Patchin?

A. Yes.

Q. Prior to this 1985 date?

A. Oh, yes.

Q. And after it as well?

A. Yes.

Q. What was the preliminary opinion of value by Mr. Patchin and Mr. Ramsland?

A. They put a preliminary valuation of 45 million dollars.

PAGE 52

Q. And that was a million dollars more than the sale price, the initial sale price?

A. It was a million dollars more than my estimate, which it was my estimate that had gone into the initial purchase document.

(Whereupon, a document entitled "Amendment of Agreement of Purchase and Sale" was marked as Exhibit-242 for identification.)

BY MR. DEIKE:

Q. I'm showing you what's been marked as Exhibit 242. I see you're getting a little bit of a pile.

MR. FRYKBERG: The ones with the blue stickers can go to the court reporter or stacked together for her. And we can sort it out later.

BY MR. DEIKE:

Q. And that document is Bates number is from CER 004131 to CER 004193, and can you tell me what it is from looking at the first page of the document?

A. It's titled, "Amendment of Agreement of Purchase and Sale." This amendment was entered into the 19th day of June 1985.

Q. Now, what it says on the front, can I

PAGE 53

refer you to the third page, CER 004133. It appears to me that it was signed by Mr. Domb on the 25th and Mr. Rogers on the 29th; is that correct?

A. Evidently.

Q. Can you tell me how this --

MR. DEIKE: Can we go off the record?

THE VIDEOGRAPHER: This is the continuance of Tape 1. Please proceed.

BY MR. DEIKE:

Q. Do you recall how this amendment came to be?

A. Not at all.

Q. Would you have reviewed the amendment?
A. Certainly.
Q. I'll refer you to the second page, it's CER 004132, and to paragraph three. Now, that paragraph provides for what it calls an executed estoppel certificate. Are you familiar with the term "estoppel certificate"?
A. Yes, I am.
Q. Can you tell me what that is?
A. An estoppel certificate is a certification from a party to the lease that

PAGE 54

nothing has changed. Typically, it would be executed by the tenant in the building and a certification made to the landlord, and the landlord could then use it to show his financial sources that the lease was in effect and everything was proceeding as it was supposed to in the lease.
Q. When you say nothing -- to show that nothing has changed. Nothing has changed from what point?
A. From the document as presented in the

lease.

Q. Let me have you turn to CER 004182. It's near the back. Would this be the form estoppel certificate?

A. Yes, it would.

Q. Now, Paragraph 5, says, "No default exists under the lease on the part of either the landlord or tenant." Was this true on July 31st, 1985?

A. I don't know. I don't know that we had entered into a lease on July 31st, 1985.

Q. Okay. Let's talk for a bit about the physical condition of the 8100 Tower and mods. Did you office in the tower?

PAGE 55

A. Yes, I did.

Q. Where did you office?

A. I was on the seventh floor in the north wing of the tower from 1971 until 1989.

Q. Anywhere else?

A. In 1989, my office moved two or three times, as my job was changing and shrinking and I was on my way out the door, but -- so I may

have been on other floors in the past year -- in the last year.
Q. Did you ever experience any water leaking in your office?
A. Not that I recall.
Q. But you're familiar that there was problem in other offices with the water leaking?
A. Yes, I knew there was a problem.
Q. You were generally familiar with the fact that there was some problem with the curtain wall and the leaking issues with that?
A. Yes.
Q. Were you aware that in the 1970's there was a lawsuit commenced by Control Data against a number of companies, including Libbey, Owens & Ford regarding the curtain wall system?
A. I don't recall.

PAGE 56

Q. You were not involved in it in any way?
A. I know I was not involved in it in any way.
Q. Does it ring any bells?
A. It does ring a bell or two, but I just

don't -- I had nothing to do with it. I don't remember.

Q. I may have asked you this before, so I apologize if I did. Did your duties at any time relate to the maintenance or any maintenance or repair issues related to the property, the headquarters?

A. No.

Q. Were you at all involved in any repair maintenance work related to curtain walls?

A. No.

Q. I want you to tell me what -- you said that you were familiar with some of the problems with the curtain wall. Can you tell me what knowledge you did have of those problems?

A. I was aware from shortly after the building was completed and had been moved into that there was a problem with window breakage and windows falling onto the grounds around the building at a higher than acceptable rate, not

PAGE 57

that I know what that rate would have been.

Q. Okay.

A. But it was higher than what people thought it should be. And I was aware that there was leakage during rainstorms, water coming through the curtain wall at a higher than acceptable rate.
Q. Were you familiar with the caulking program that was performed to try to eliminate the problem?
A. I knew that after the problem had been determined and there were people working on solutions, and the solution that I recall having arrived at was to use a different type of caulk, perhaps, applied in a different way and redo the entire curtain wall system with this different caulk. And as I recall, it substantially improved the problem to the point where it was no longer considered a significant problem.
Q. Were you privy to any of these meetings, decision-making processes relating to the caulking?
A. Not in the decision-making process, but I was -- would be in meeting with my

supervisor, staff meetings, where he would meet with me and other people who were working on that project or working on the problem and coming up with solutions and implementing them. So I would hear them discuss it just as they might hear me discuss something about the real estate area.

Q. Do you recall when you -- when it was that you first heard some of these discussions about the caulking program; was that prior to or after the sale leaseback?

A. It would have been prior to. I couldn't have answered that before I looked at some of the papers that I've I looked at here, because it was happening on a continuum, and I don't remember where I was at a specific time or a specific date, but --

Q. And you said that it was your understanding that this caulking program was working, how did you come to that understanding?

A. That the leakage had been greatly reduced.

Q. How did you know that?

A. That was what was reported.

Q. Do you remember who would have reported

PAGE 59

that?

A. It would be speculation on my part. I know who was working on it, and I would have known who was talking about it at these staff meetings, but I don't remember the conversation.

Q. Who would that have been?

A. It would have been Jim Allen, who had responsibilities for maintenance. He had a gentlemen working for him by the name of Dave Tregilgas, who was in charge of most of maintenance items. And Bob Darr would also have been at those staff meetings and discussing them. Bob was the -- oh, well, he was a troubleshooter, among other things.

Q. Was he an engineer?

A. Yes.

Q. I'm going to show you what's been marked

PAGE 60

as Nolan Exhibit 120 and have you take a look

at that letter.
A. (Whereupon, the witness is reviewing the document.)
Q. Do you recall this document?
A. I don't recall it from 1984. I looked at it yesterday.
Q. And I'll note that a copy of this was sent to you; was it not?
A. Yes.
Q. You mentioned that Robert Darr was a troubleshooter. Can you be a little more specific about what his duties were?
A. Well, he was corporate planning engineering services, as his title says, he had three or four people working for him. And whenever there was a problem related to a facility anywhere in the corporation, they would call Bob. If it was an air conditioning problem, something they thought was a structural problem, electricity wasn't running in the right direction, or whatever. Bob was known to be a great facility detective. He could go in and figure out -- or he or one or two or three

people that worked for him.

PAGE 61

Q. It says --

A. So he would have been involved in that process of looking at the curtain wall.

Q. It says in the first sentence, "I have been asked to outline the history and present status of curtain wall system." Do you know who asked him?

A. I don't know.

Q. Was it you?

A. Could have been. I don't know.

Q. Can you tell me why this letter was prepared?

A. I don't know.

Q. I'll note that it's directed to Mr. Patchin, and apparently Mr. Ramsland. Do you recall if it was something that they had requested for their appraisal?

A. No, I don't recall.

MR. FRYKBERG: I would note for clarification, also Mr. Nolan.

BY MR. DEIKE:

Q. Were there any meetings that you recall regarding the preparation of this letter?

A. None that I recall, no.

Q. Is it possible that there may have been?

PAGE 62

A. It is possible there may have been, sure. Most likely what would have happened is I -- well, that's pure speculation. I don't know.

BY MR. DEIKE:

Q. Well, why don't you tell me what you're thinking?

A. What it appears to be from looking at the letter, the letter -- the subject came up somchow from some direction, I don't know what direction, and it was thought that there should be a clarification as to what was going on with regard to the curtain wall. And I would have asked Bob Darr if he could summarize what was going on with the curtain wall and tell all the parties involved.

Q. Do you remember having any conversations
with anybody at UTF asking about the curtain
wall condition?
A. Not that I remember.
Q. How about the appraiser?
A. Not that I remember.
Q. Would you have assisted in drafting this

PAGE 63

letter?
A. No. No.
Q. Would you have received a draft of it
prior to it getting sent out?
A. Is it conceivable? Yes. Did I? Not
that I recall. But I don't recall the letter
at all, so --
Q. Did you get a chance to read through
it? You said you read through it yesterday?
A. Yes.
Q. Would you agree with the content of this
letter?
A. Indeed, yes, I do.
Q. Anything that you would disagree with?
A. No.

Q. Are you aware of any conversations -- you said you didn't put -- that anyone else had with UTF regarding the condition of the curtain wall?

A. I couldn't guess I didn't understand the question.

BY MR. DEIKE:

Q. Are you aware of any conversations

PAGE 64

between anyone at Control Data and anyone at UTF regarding the condition of the curtain wall?

A. No.

Q. Let me rephrase that. Did you make any communication or representations to UTF regarding the condition of the curtain wall?

A. Not that I'm aware of.

Q. Outside of this letter Nolan Exhibit 120, the Darr letter, are you aware of any communications or representation made by anyone at Ceridian regarding the condition of the curtain wall?

PAGE 65

A. No.
Q. How about any other physical condition of the building?
A. No.
Q. I'm going to show you what's been marked as Nolan Exhibit 121. And I'm afraid this is one of those exhibits that I don't have an extra copy of.
MR. FRYKBERG: That's okay.
BY MR. DEIKE:
Q. This is Bates number from CER 004709 to CER 004821. And can you take a look at it and actually take a look at CER 004711. And I think you have got it right there. Is this the final appraisal report from Mr. Patchin and Mr. Ramsland?
A. It appears to be the appraisal report that we had previously received a preliminary report on, and a few days later on July 12th, or thereabouts, we received the completed appraisal. I also had the opportunity to page through this document yesterday. And it appears

to be a professional first-class appraisal, just
as I would expect it to be, from Mr. Patchin.
Q. Now, this is dated July 12th, 1995.

PAGE 66

Did you have any communications with either of
those gentlemen in between when you received the
preliminary opinion and the date of this report?
A. Not that I recall. If it's like most
cases, I'm sure I was calling every day asking
where it was, but I don't recall at all.
Q. Now, this is a letter to you I see as
general manager of corporate real estate;
correct?
A. Yes.
Q. And what was their final appraisal
value?
A. Their final appraisal value for the
headquarters buildings was 45 million dollars,
the same as their preliminary appraisal.
Q. Let me have you turn to CER 004811 and
4812. And would you agree that that's a copy
of the Darr letter we have been talking about
as Exhibit 120?

A. Yes, it is.
Q. Now, if I could have you go two pages further to 004183?
A. 4813?
Q. 4813, sorry. And at the top of the page it says, statement of limiting conditions.

PAGE 67

If I could refer you down to Paragraph 10, and that says, the appraisers are aware of the CDC letter of July 9th, 1985, regarding the curtain wall window unit problem and assume that the condition will shortly be resolved to the satisfaction of all parties without a major financial burden on the operation of the project, the operation of the property, I'm sorry.
Is it your understanding that the CDC letter of July 9, 1985, is that Darr letter that we're talking about?
A. That would be my understanding.
Q. Now, when it talks about the condition will shortly be resolved to the satisfaction of all parties without a major financial burden on the operation of the property, was that your

understanding of the circumstance of the curtain wall?

A. My understanding of the curtain wall situation was just as outlined in the Darr letter. And well, I'll leave it at that.

BY MR. DEIKE:

Q. Was it -- let me put it this way: Was

PAGE 68

it your understanding the curtain wall issue simply wasn't an issue?

A. Well, it had been an issue because it had been a significant problem. And as outline in the Darr letter, we had -- had put together a fix for the problem that made it a much less significant problem.

BY MR. DEIKE:

Q. Was it your understanding that in the next year or so the curtain wall problem would be fixed?

A. Yes, depending, of course, on what you

mean by "fixed."

Q. Well, when you say, yes, it would be fixed, why don't you tell me what you mean by what you thought the "fix" would be?

A. That the curtain wall would be caulked sufficiently so that water would not come through in amounts which would be contrary to the intended use of the building.

Q. Well, let me see if I can -- I guess I don't quite understand that answer.

A. What I'm avoiding saying is that we are going to fix it so that there would be no more

PAGE 69

leaks in the curtain wall.

Q. Okay.

A. Since that would be a goal, an unachievable goal.

Q. What in your opinion would be an achievable goal?

foundation, speculation. You can answer, if you know.

A. To reduce the leakage to the point where

the -- it's not deleterious to the use of the building.
BY MR. DEIKE:
Q. Now, considering the language in Paragraph 10 there and considering the fact that the appraisal value was identical to the preliminary value, would you say that this information provided in the Darr letter had no affect on the valuation?
A. I would have no way of knowing that, I guess.
BY MR. DEIKE:
Q. Well let's -- let me walk through this

PAGE 70

a little bit. The -- Mr. Patchin and Mr. Ramsland gave a preliminary value of 45 million; correct?
A. That's correct.
Q. And maybe we can refer back to the document, which was Exhibit 241?
A. That's correct.

Q. And what is the date of that preliminary opinion?

A. June 20th.

Q. Now, after that, Mr. Darr provides them, Mr. Patchin and Mr. Ramsland, with this letter regarding the curtain wall; correct?

A. That's correct.

Q. And after that, they come up with this Exhibit 121, which is their final value; correct?

A. That's correct.

Q. And that's also 45 million?

A. That's correct.

Q. So at least you can agree that the value has remained the same, despite this Darr letter that was written?

A. Yes, I can agree with that.

Q. I'm showing you here what's been marked as Nolan Exhibit 123 again. I'm sorry, I don't

PAGE 71

have --

MR. FRYKBERG: That's okay. I have copies.

BY MR. DEIKE:

Q. This is Bates number from PRUD 02718 to PRUD 02766. Do you recognize this as the lease agreement between Control Data and UTF for the headquarters property?
A. I recognize it from my paging through it yesterday, but I don't recall the document from 1985, no.
Q. Why don't you flip to the last page of the document 46, if you would. Is that Mr. Rogers again executing it on behalf of Control Data?
A. Yes, it is. That's my writing underneath his signature, too.
Q. It is. Okay. And then I'll have you flip back to nearly the beginning. It's PRUD 2721. Can you tell me what the date of the lease agreement is?
A. July 29, 1985.
Q. Does that refresh your recollection in any way as to the timing of when the lease began?

PAGE 72

A. No.

Q. Do you say that you had been involved in the negotiation of the lease?
A. Yes.
Q. Do you have any recollection of how that worked; did someone -- can you tell me who prepared the initial draft of all these?
A. I don't know who prepared the initial draft. I know that Control Data did not have a standard sale and leaseback form that we used. So it would be speculation, but I speculate that the buyer provided it.
Q. Can you tell me who would have reviewed the lease before signing it; would you have?
A. Yes, I would have.
negotiation of the lease terms was a Control Data attorney, same one whose name I cannot think of.
Q. Was this an in-house counsel or?
A. Yes, he was.
Q. Did you or did anyone else at Control Data propose any changes in the lease agreement from the one, the initial one?

PAGE 73

A. That would be speculation on my part.
I can't imagine that we failed to propose some changes, but I don't remember anything about it.
Q. Do you recall if any changes were incorporated? I suppose not?
A. I'm sure there were, but I don't remember.
Q. Let me refer you to Paragraph 2.1, which is on Bates number PRUD 2725, entitled "Maintenance and Repair."
A. Yes.
Q. Do you recall any discussions regarding the maintenance repair obligations during the negotiations of the lease?
A. No, I don't.
Q. Do you recall if there were any changes -- let me step back a second. As we noted before with that purchase agreement, there was a draft lease in there. Do you recall if there were any changes in the maintenance or repair language from that time to --
A. No, I don't.
Q. And you said you don't recall any

negotiations regarding the --
A. I don't recall anything specific about

PAGE 74
the negotiations, other than we would have had some.
Q. This -- the first sentence there says, lessee, and that's Control Data; is that correct?
A. That's correct.
Q. Acknowledges that it has received the premises in good order and repair. Was this sentence true on July 31st, 1985?
A. Yes.
Q. Would you say that the curtain wall was in good order or repair on July 31st, 1985?
A. Yes
BY MR. DEIKE:
Q. Now, that Darr letter that we referred to, which is written in July of '85, seemed to indicate that there were problems with the curtain wall but that they thought they were going to get them fixed; is that correct?
A. That's correct.

Q. Are you familiar with the term triple-net lease?
A. I have heard that term used, yes.
Q. How many transactions have you dealt

PAGE 75

with involving triple-net leases?
A. Oh, probably hundreds. But any time anyone uses it, it's such an imprecise term, I usually ask them what they mean.
Q. How would you define a triple-net lease?
A. I wouldn't use the term. People use it when they mean to imply what it is that the tenant is paying for under the terms of the lease. And typically, when they say, triple net, they mean that the tenant is paying for taxes, insurance, utilities; maintenance -- what I have I missed? That's it. And yet it's a very ill-defined term.
So if someone says, this is a triple-net lease, I then ask who is paying for the taxes and who is paying for the utilities, etcetera.
Q. Would you say the same thing about the

term just regular net lease?
A. It implies a general condition, which I understand used to show that (phonetic), but -- so that's why I answered somewhere in a hundred or so in net leases that I probably entered into, even though it's very imprecise and perhaps on some of those the landlord paid base year1 that point?

PAGE 76

taxes which, of course, would be included in the rent. And I would pay or the tenant would pay some amount more than that as the taxes increased every year and things like that.
Q. Can you tell me who was responsible for paying taxes under this lease?
A. Control Data Corporation.
Q. Who was responsible for paying insurance?
A. Control Data Corporation.

PAGE 79

Q. Do you recall how long a lease term it was?

PAGE 80

A. I believe it was 15 years, but I want to check to see if that was true.

Q. I think you're right. Were there options to extend the lease?

A. Yes, there were. There was one option to extend at a fixed rate, and then two or three more options to extend at the then market rate.

Q. Do you recall what your thoughts or Control Data's thoughts were behind having the option to extend the lease?

A. My thoughts as to why we would want lease extensions is that it was the world headquarters that we -- if we were still in need of the same type of space and quantity of space, we would want to have the ability to stay there. But if that no longer met our then purposes, technology or economically or from a site speculation or location perspective, then we would want the ability to leave.

Q. Were you aware of any plans at the time whether Control Data wanted to stay in the premises passed the 15-year period or leave at

PAGE 81

that point?
A. No. Oh, no, we couldn't have looked 15 years ahead. Oh, no.
Q. Is it your undcrstanding that Control Data had some options to purchase the property back from UTF?
A. I don't recall that we did, no.
Q. Why don't you take a look at Page 6, Section 3.1. It's Bates number PRUD 2726.
A. I see that we indeed did have certain purchase options at a price to be based on whatever the rent was that we then -- not the rent that we were then paying, based on the then fair market rental value. I hadn't -- I didn't remember that though.
Q. Do you recall why that option was provided?
A. Oh, I would speculate that it's for the same reason that I mentioned before, if the property still met with our requirements, and perhaps at that point, it would -- could be economically justified to purchase it back, maybe

we would want to make some additions to it, or
change the function of it, you wouldn't know.
So you would try to build in as much

PAGE 82

flexibility as you possibly could.
Q. Were you aware that UTF was financing the purchase of the property?
A. Yes.
Q. Were you aware that Prudential was supplying some of the funds for it?
A. I remembered being surprised that Prudential was -- when I learned that, either shortly before or after the closing, I hadn't realized that Prudential was involved with it.
Q. Did you have any contact with anybody at Prudential?
A. No.

PAGE 83

Q. Did you ever provide Prudential or anyone associated with them with any information on the building?
A. Not that I'm aware of. Well, indirectly

PAGE 84

whoever had brought them into the deal, UTF
would have provided them with anything that I
provided UTF, I'm sure. I would assume so.
Q. Are you familiar with an entity called
Fortune Funding Company?
A. No, other than having looked at these
documents yesterday and understanding that they
are the successor to UTF.
(Whereupon, a three-page letter
dated December 10th, 1985, was marked as
Exhibit-243 for identification.)
BY MR. DEIKE:
Q. I'm going to show you what's been marked
as Exhibit 243. Why don't you take a look at
that?
(Whereupon, the witness is
reviewing the document.)
BY MR. DEIKE:
Q. Now, this is a letter, and I'll point
out that it's Bates numbers FF 002008 to FF
002010. And I'll note that it's a letter dated
December 10th, 1985, from you to Fortune Funding

Company; is that right?
A. That's correct.
Q. Do you recall seeing this letter before?
A. I don't recall it at all. Obviously, I saw it, I signed it.
Q. That is your signature on the second page; correct?
A. Yes, it is.
Q. Now, it says on the first sentence, "We have been advised that you're proposing to an acquired interest in the above referenced property, which is the headquarters." Can you tell me how you were advised of that?
A. No, that would be speculation on my part. I suspect I got a call from the treasurer's office.

PAGE 86

Q. And you said you don't recall how you learned of Fortune Funding's interest?
A. No, I don't.
Q. I'll note the start of the third paragraph, it says, "At your request, we are advising you of the following..." Can you tell

me how Fortune Funding requested this information from you?

A. I don't know.

Q. Do you know how the request was communicated to you personally?

A. No, I know how it would typically have been done, but I don't remember this at all.

Q. Why don't tell me how it was typically done?

A. We would have received a letter, or the treasurer's office, most likely, would have received a letter from Fortune Funding Company asking us to execute an attached document. And the attached document would have looked very much like this. And rather than sign that document, I would have prepared this one and signed it and sent it to them. I might have done that

PAGE 87

that way simply because it was something on their document that I didn't like or couldn't agree with or didn't understand or --

Q. Other than this letter, did you have any communications with anyone at Fortune Funding?

A. Not that I recall.

Q. Now, looking at the content of what you're advising them, that appears to be similar to the estoppel certificate language that was provided to UTF, not identical, but --

A. Very much so.

Q. Would you call this an estoppel certificate?

A. I would call it that. I'm not sure

PAGE 88

that would be technically correct, but --

Q. Why do you think that would not be technically correct?

A. Oh, I don't know. I'll call it an estoppel certificate.

Q. Let me rephrase that. It sounded like you said earlier, typically someone would have drafted this letter for your signature; is that correct?

BY MR. DEIKE:

Q. Why don't you refresh my recollection.

A. I had the ability to sign these whether I drafted it or whether someone else in the real estate department drafted it for me. I don't know. I don't remember the letter. But the other people in the real estate department had not been authorized to execute such documents by Control Data's Board of Directors, I had

PAGE 89

been.

Q. Why don't you take a look at Paragraph 5 on the second page. It says, lessee, again, that would be Control Data, has no knowledge of any default under the lease. Was that true as of December 10th, 1985?

A. Yes, it was.

Q. What did you do to determine whether it

PAGE 90

was true or not?

A. I was not aware of any event which would have constituted a default on the part of either the lessor or the lessee.

Q. Besides what you may have generally been aware of at the time, did you do any

investigation to determine if there were any defaults that you might not have been aware of?
A. I would have been aware of any defaults, so --
THE COURT REPORTER: I'm sorry, what was the end of that?
A. I would have been aware of any defaults.
BY MR. DEIKE:
Q. Did you conduct any investigation into whether the building was in good condition at the time?
A. No specific investigations, no.

PAGE 92

Q. And we talked about the lease being on -- I don't remember the exact date, end of July 1985, and now this letter is dated the 10th of December 1985, had anything changed with respect to the curtain wall between those times?
A. Not that I'm aware of.

BY MR. DEIKE:

Q. Did you conduct any investigation prior to sending this letter about the condition of

PAGE 93

the curtain wall specifically?

A. No, I did not.

Q. Let me know if you worked with these folks: Dave Tregilgas?

A. Yes.

Q. What was your relationship with him?

A. Dave Tregilgas was an engineer, property management. He worked for Jim Allen. He had a lot to do with the curtain wall.

Q. And professionally how did your two roles interact?

A. He worked for Jim Allen and Jim Allen and I both worked for Pat Conway. I guess we wouldn't have interacted, other than to see each other at lunch.